[This opinion has been published in *Ohio Official Reports* at 89 Ohio St.3d 342.]

THE STATE OF OHIO, APPELLANT AND CROSS-APPELLEE, *v*. REINER, APPELLEE AND CROSS-APPELLANT.

[Cite as *State v. Reiner*, 2000-Ohio-190.]

*Evidence—Prohibitions in Evid.R. 606(B) against receiving evidence from a juror apply to alternate jurors—Evidence received from alternate juror, without other outside evidence, is insufficient aliunde evidence under Evid.R. 606(B) upon which a court may rely in order to conduct inquiry of other jurors into validity of a verdict.*

1.  The prohibitions against receiving evidence from a juror in Evid.R. 606(B) apply to alternate jurors.

2.  Evidence received from an alternate juror, without other outside evidence, is insufficient *aliunde* evidence under Evid.R. 606(B) upon which a court may rely in order to conduct an inquiry of other jurors into the validity of a verdict.

(Nos. 99-239 and 99-427—Submitted January 11, 2000—Decided July 26, 2000.)

APPEAL and CROSS-APPEAL from and CERTIFIED by the Court of Appeals for Lucas County, No. L-97-1002.

————————————

{¶ 1} Appellee and cross-appellant, Matthew Reiner, was convicted by a jury of involuntary manslaughter for the death of his two-month-old infant son, Alex Reiner. Alex died as a result of "shaken baby syndrome."

{¶ 2} On June 15, 1995, Deborah S. Reiner gave birth to twin boys named Alex and Derek. Both boys were premature at birth but otherwise healthy. The Reiners also had a two-year-old daughter named Amy. Following the birth of the twins, both parents took time off from work to care for them. Matthew Reiner took

leave from his job as an engineer from June 15 to July 25, 1995. Deborah Reiner, a dentist, did not return to work until August 14, 1995.

{¶ 3} The Reiners hired a full-time babysitter, Susan Batt, age twenty-four, to care for their three children. Susan Batt began working on July 25, 1995, under Deborah Reiner's supervision while Susan Batt became acclimated to the family. During the first week of Susan Batt's employment, Deborah Reiner spent most of her time at home. In the final two weeks before Deborah Reiner returned to work, she left the home on several occasions with Amy, leaving Susan Batt alone with the twins. Susan Batt became the full-time exclusive childcare provider on August 14, 1995.

{¶ 4} Over a period of two weeks, the following events occurred. Alex became ill the weekend of August 12, 1995. He appeared to be achy and vomited several times. Deborah Reiner called the pediatrician and then took Alex to an outpatient clinic on Sunday, August 13. The clinic doctor diagnosed stomach flu and recommended that Deborah Reiner give Alex Pedialyte.

{¶ 5} By Wednesday, August 16, 1995, Alex had improved and appeared to have recovered. The twins' pediatrician performed a well-care examination of both boys that day. The results were unremarkable.

{¶ 6} Deborah Reiner stayed home with the children on Wednesday, August 23, 1995, her regular day off. Alex seemed achy that day but had no fever. On Thursday, August 24, 1995, Susan Batt telephoned Matthew Reiner at work and reported that Alex had vomited in the morning. He told her to give Alex some Pedialyte. On Friday, August 25, Susan Batt telephoned Deborah Reiner at work to report that Alex had vomited. Deborah Reiner's mother came over Friday afternoon to help care for the children. Alex remained ill and vomiting over the weekend, still with no fever.

{¶ 7} On Monday, August 28, 1995, when Deborah Reiner returned home after work, Susan Batt reported that Alex had eaten well and taken two five-hour

naps that day. He appeared achy but did not have a fever, and Susan Batt had given him Tylenol. Susan Batt left the Reiners that evening between 5:30 and 6:00 p.m. Later that evening, Deborah Reiner's parents stopped by to drop off Amy, who had spent the day with them. They stayed and visited until 7:30 p.m. when Matthew Reiner arrived home.

{¶ 8} Alex vomited again that evening at 9:00 p.m. The couple put the twins to bed at approximately 10:30 that night. Later, they heard Alex whimpering. Matthew Reiner took Alex downstairs. He claimed that he laid Alex on his (Matthew's) chest to try to get the baby comfortable and to fall asleep. Within a half hour, Alex's breathing became labored and he became unresponsive. Matthew Reiner took Alex to his bedroom to awaken his wife. She could not get Alex to respond, so Matthew Reiner called 911.

{¶ 9} When emergency personnel arrived, Alex had no pulse and was not breathing. His skin was blue. They transported Alex to a nearby hospital, where he was placed on a respirator. Two days later, on August 30, 1995, Alex was removed from life support and died.

{¶ 10} Dr. James Patrick, Lucas County Coroner, performed an autopsy. He concluded that Alex had died from "shaken baby syndrome." Dr. Patrick estimated that the time of injury was the evening of Monday, August 28, 1995, most likely within minutes of the onset of respiratory arrest when Matthew Reiner had been alone with Alex, but at most, within two to three hours of the onset.

{¶ 11} A grand jury indicted Matthew Reiner for involuntary manslaughter. The case proceeded to trial. The key issue at trial was the timing of the fatal trauma to Alex. The defense theory was that Susan Batt, not Matthew Reiner, was the culpable party. The defense presented evidence that all three Reiner children had been healthy from birth until the weekend of August 11, 1995, after Susan Batt became employed. Deborah Reiner testified that her children had no medical problems from the time of Alex's death until the trial, after Susan Batt left the

Reiners' employ. Deborah Reiner also testified that no other family members had contracted a stomach virus or suffered symptoms similar to Alex's during the last two weeks of August despite their close proximity to Alex, in particular his twin, Derek, who slept in the same crib. There also was evidence of additional injuries to Alex and injuries to Derek. A hospital radiologist testified that x-ray films of Alex taken at the hospital on August 29, 1995, indicated a broken rib and broken leg. Subsequent x-rays of Derek indicated that he suffered from three broken ribs.

{¶ 12} Dr. Patrick testified on behalf of the prosecution. He explained that, based upon his findings from the autopsy and the lack of any evidence of a blow to the head or other significant trauma, Alex had died of shaken baby syndrome. Dr. Patrick testified that the brain had been injured when it was "subjected to forces operating in different directions" that caused the blood vessels to tear. He described these forces as "shearing forces" that rapidly disrupted the electrical circuitry of the brain and caused loss of consciousness. Dr. Patrick testified that when this occurs, the brain is profoundly disrupted and no longer capable of responding to stimuli. Although there was evidence of brain swelling, Dr. Patrick testified that swelling is merely an indication that there has been an injury.

{¶ 13} After the autopsy, Dr. Patrick prepared slides of brain tissue in order to examine microscopically the various injuries inside the brain. He testified that the slides confirmed the presence of blood and the brain injury.

{¶ 14} During cross-examination, defense counsel questioned Dr. Patrick about the significance of the swelling of the brain, or edema. Dr. Patrick stated that although edema was present and played a role, the principal problem was the mechanical disruption to the circuits of the brain. Defense counsel then asked Dr. Patrick about his testimony to the grand jury in which he attributed Alex's loss of consciousness and lack of breathing to swelling of the brain within a confined space. When confronted with statements taken from his testimony given to the

grand jury in this case, Dr. Patrick reviewed the page from the grand jury transcript and admitted that he had made the statements.

{¶ 15} The trial court refused to admit into evidence only one page from the transcript of Dr. Patrick's grand jury testimony because one page taken out of context would not have fairly and accurately represented his grand jury testimony. Defense counsel, however, would not agree to the admission of the entire statement. Defendant then moved to strike Dr. Patrick's opinion as unreliable under Evid.R. 702(C). The court overruled the motion.

{¶ 16} Dr. Elizabeth K. Balraj, the Cuyahoga County Coroner and a professional acquaintance of Dr. Patrick, also testified on behalf of the prosecution. She testified that the Lucas County Coroner's Office sent her information about this case, including the autopsy report, Alex's medical records, and photographs and slides taken at the time of the autopsy. Dr. Balraj also testified that Alex died as a result of shaken baby syndrome. In response to a lengthy hypothetical question that asked Dr. Balraj for her opinion "to a reasonable degree of medical certainty" as to when the injury was inflicted upon Alex in relation to his collapse, Dr. Balraj responded that "the type of injuries and the information that you have given me is consistent with the child sustaining the injury sometime between 10:30 p.m. and 11:00 p.m."

{¶ 17} Susan Batt was subpoenaed by the prosecution and the defense. She invoked her Fifth Amendment privilege against self-incrimination and refused to testify. She had also invoked her Fifth Amendment privilege while testifying in the juvenile court proceeding. The prosecution requested that the court grant Susan Batt transactional immunity pursuant to R.C. 2945.44 and compel her to testify. The prosecution told the court that it did not presently intend to prosecute Susan Batt for this crime. The court granted her transactional immunity.

{¶ 18} Having been granted transactional immunity, Susan Batt subsequently testified. She explained to the jury that she had refused to answer

questions without a grant of immunity upon the advice of counsel although she had done nothing wrong. She testified that she had attended a nanny and governess school in Cleveland. She previously worked for three years as a live-in nanny for another family with three children. She learned of the position with the Reiner family through a newspaper ad. She began working limited hours for the Reiners on July 25, 1995, while she became acquainted with the children and their routines. When Deborah Reiner returned to work on August 14, 1995, Susan Batt worked from 7:30 a.m. to 5:30 p.m. on Mondays, Tuesdays, Thursdays, and Fridays.

{¶ 19} Susan Batt testified that she had never shaken the children while she was alone with them. She specifically denied shaking Alex on August 28, 1995. She testified that she did nothing to harm any of the Reiner children. She also testified that she was not aware that Alex had a broken leg or that Derek had some broken ribs. She denied that she had anything to do with the broken bones.

{¶ 20} Susan Batt testified that she last worked for the Reiners on Tuesday, August 29, 1995, the day after Alex had been taken to the hospital. She learned of Alex's death through the news. She had no further contact with Reiners.

{¶ 21} On September 23, 1996, a jury convicted Matthew Reiner of involuntary manslaughter. Two weeks later, the defense filed a motion for acquittal or, in the alternative, for a new trial. The defense claimed that the verdict was not supported by the evidence. The defense also alleged legal errors and procedural irregularities with regard to the grant of immunity to Susan Batt, jury instructions related to Batt's testimony and her implied admission of guilt, and the court's refusal to permit defense counsel to ask Susan Batt about other injuries to the Reiner children.

{¶ 22} The defense motion alleged prosecutorial misconduct in failing to disclose that Dr. Patrick was allegedly changing his testimony or theory of the case. The defense also claimed that the trial court should have admitted Dr. Patrick's grand jury testimony as a prior inconsistent statement, and that the court should

6

have stricken as unreliable the opinions of the coroners who testified for the prosecution. Finally, the defense alleged juror misconduct and attached the affidavit of Rolf R. Sandberg, an alternate juror. In his affidavit, Rolf Sandberg admitted that during the trial, he had discussions with several other jurors about the case, including assessments and characterizations of the evidence, the credibility of witnesses, and his opinion about the guilt or innocence of the defendant.

{¶ 23} The trial court conducted an *in camera* inspection of Rolf Sandberg on October 31, 1996. The court then subpoenaed each juror to appear and testify about the alleged misconduct. Thereafter, the trial court denied the motion for new trial. The court determined that Rolf Sandberg's affidavit did not constitute competent non-juror evidence under Evid.R. 606(B), because he was an alternate juror. Furthermore, even assuming that Rolf Sandberg's affidavit was competent evidence, the court concluded that he was not a credible witness. The court said it should not have conducted the hearing and specifically was not considering any statement by the jurors. The court found no prejudice to the defendant as a result of any jury conduct, and even if misconduct occurred that was presumed to be prejudicial, the state had rebutted the presumed prejudice beyond a reasonable doubt.

{¶ 24} Matthew Reiner appealed his conviction to the Lucas County Court of Appeals. The appellate court reversed the trial court solely on the issue of juror misconduct. The appellate court considered Rolf Sandberg's affidavit as outside evidence of extraneous prejudicial information that had been improperly brought to the jury's attention. The appellate court concluded that there had been juror misconduct that was prejudicial to the defendant. The appellate court also considered as misconduct the failure of the other jurors to abide by the trial court's instruction not to discuss the case with anyone including each other until deliberations began. The court considered this fact to be evidence that Rolf Sandberg's conduct tainted the jury panel.

**{¶ 25}** The appellate court affirmed the trial court's grant of transactional immunity to Susan Batt. The court held that, at the time immunity was granted, it did not appear to Susan Batt that she lacked culpability because she knew the defense was going to try to blame her for Alex's death. When it granted her immunity, the trial court did not know if the defense had any evidence that would implicate Susan Batt. Therefore, at the time, the trial court would not have known that Susan Batt's assertion of her Fifth Amendment right against self-incrimination was a mistake.

**{¶ 26}** The appellate court also affirmed the trial court's refusal to strike Dr. Patrick's testimony as to the cause of Alex's death. The court reasoned that the defense's objection that Dr. Patrick did not have the appropriate tissue slides to support his conclusion about the cause of death went to the weight of the evidence rather than to its admissibility. The appellate court also upheld the trial court's decision not to admit Dr. Patrick's grand jury testimony as a prior inconsistent statement. The appellate court concluded that Dr. Patrick admitted he had made the alleged inconsistent statements to the grand jury; thus, the trial court did not have to admit the prior testimony.

**{¶ 27}** As to the legal sufficiency of the opinion given by Dr. Balraj concerning the timing of Alex's collapse, the appellate court concluded that Dr. Balraj's use of the word "consistent" instead of "probable," when giving her opinion as to the timing of the injury, was not a fatal error. In addition, the court determined that Dr. Balraj's testimony was cumulative. The appellate court also found that the trial court did not abuse its discretion in refusing to instruct the jury on implied admission of guilt.

**{¶ 28}** Thereafter, the court of appeals determined that its judgment that Evid.R. 606(B) bars any inquiry of a juror as to the effect of extraneous information or improper outside influence upon his or her decision-making process was in conflict with *State v. Thomas* (July 26, 1995), Athens App. No. 94CA1608,

8

unreported, 1995 WL 468183. The appellate court entered an order certifying a conflict.

{¶ 29} The state appealed and the defendant filed a cross-appeal.

{¶ 30} This cause is now before this court upon our determination that a conflict exists (case No. 99-427), and pursuant to the allowance of a discretionary appeal and cross-appeal (case No. 99-239).

———————————

*Julia R. Bates,* Lucas County Prosecuting Attorney, *John J. Weglian* and *J. Christopher Anderson*, Assistant Prosecuting Attorneys, for appellant and cross-appellee.

*Fritz Byers, Robert Z. Kaplan* and *Samuel Z. Kaplan; Cooper, Walinski & Cramer* and *Richard S. Walinski*, for appellee and cross-appellant.

———————————

**LUNDBERG STRATTON, J.**

{¶ 31} The Lucas County Court of Appeals stated the certified conflict as "whether Evid.R. 606(B) permits, under any circumstances, inquiry of a juror as to the effect of extraneous information or improper outside influence upon his or her decision making process." The dissenting judge framed the same issue as follows: "[I]n a case of jury misconduct (statements, conversations or remarks made to a juror), once evidence *aliunde* of jury misconduct is provided, whether a court may inquire of a juror as to whether or not the juror remained uninfluenced by the misconduct (*i.e.*, impartial) so that the defendant was not denied his substantial rights." Because this latter statement more succinctly states the issue, we shall consider the certified conflict in the terms articulated by the dissenting judge.

{¶ 32} The state's discretionary appeal involves the related issues of burden of proof when there are allegations of juror misconduct in a criminal case, and whether an affidavit from an alternate juror constitutes outside evidence sufficient to trigger the application of Evid.R. 606(B), otherwise known as the *aliunde* rule.

{¶ 33} The defendant's cross-appeal challenges the validity of the transactional immunity granted to Susan Batt, the reliability of the opinions rendered by the state's medical witnesses, the trial court's failure to admit Dr. Patrick's grand jury testimony for impeachment purposes, and Dr. Balraj's expression of her medical opinion on causation.

{¶ 34} For the reasons more fully set forth below, we reverse the judgment of the court of appeals as to juror misconduct and the grant of transactional immunity to Susan Batt, and we affirm the remainder of the court's judgment.

JUROR MISCONDUCT

{¶ 35} Because the certified conflict presumes the existence of *aliunde* evidence, before we may address this issue, we must decide the threshold question of whether Evid.R. 606(B), also known as the *aliunde* rule, applies to alternate jurors. For the reasons more fully set forth below, we hold that the prohibitions against receiving evidence from a juror in Evid.R. 606(B) apply to alternate jurors. Therefore, evidence received from an alternate juror, without other outside evidence, is insufficient *aliunde* evidence under Evid.R. 606(B) upon which a court may rely in order to conduct an inquiry of other jurors into the validity of a verdict.

{¶ 36} It is a longstanding rule that "the verdict of a jury may not be impeached by the evidence of a member of the jury unless foundation for the introduction of such evidence is first laid by competent evidence *aliunde*, *i.e.*, by evidence from some other source." *State v. Adams* (1943), 141 Ohio St. 423, 427, 25 O.O. 570, 572, 48 N.E.2d 861, 863. Ohio has adopted this rule in Evid.R. 606(B), which states:

"Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith. A juror may testify on

the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear on any juror, *only after some outside evidence of that act or event has been presented*. However a juror may testify without the presentation of any outside evidence concerning any threat, any bribe, any attempted threat or bribe, or any improprieties of any officer of the court. *His affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying will not be received for these purposes*." (Emphasis added.)

{¶ 37} The rule is intended to preserve the integrity of the jury process and the privacy of deliberations, to protect the finality of the verdict, and to insulate jurors from harassment by dissatisfied or defeated parties by prohibiting a court from questioning a juror about what occurred during deliberations, or about anything else that may have affected the juror's mind or emotions in the deliberations process once a final verdict is rendered. *State v. Schiebel* (1990), 55 Ohio St.3d 71, 75, 564 N.E.2d 54, 61; *State v. Adams*, 141 Ohio St. at 427, 25 O.O. at 572, 48 N.E.2d at 863. However, if there is a foundation of outside evidence of extraneous prejudicial information, or of any threat, bribe, or improper conduct by an officer of the court, the rule permits a court to ask a juror about that outside evidence.

{¶ 38} The trial court determined that Rolf Sandberg's affidavit was not competent evidence to attack the jury's verdict under Evid.R. 606(B). The court reasoned that the intent of Evid.R. 606(B), to prevent an attack by a disgruntled juror, should likewise apply to an alternate juror.

{¶ 39} The court of appeals reversed on the basis of *State v. Rudge* (1993), 89 Ohio App.3d 429, 624 N.E.2d 1069. The *Rudge* court considered an alternate juror to be outside the regular jury panel because an alternate does not participate in deliberations or in reaching the final verdict. *Id*., 89 Ohio App.3d at 437, 624 N.E.2d at 1074. In *Rudge*, after the trial was over, an alternate juror informed the

bailiff that on two occasions he had overheard other jurors make statements about the defendant prior to opening statements and during the trial. The trial court conducted an *in camera* examination of the alternate juror, followed by an examination of the remaining jurors. The court granted a mistrial on the basis that one of the statements was prejudicial. The court of appeals noted that, as a nondeliberating juror, an alternate may not be viewed as a member of the jury, so that the alternate's testimony may constitute *aliunde* evidence for purposes of Evid.R. 606(B). However, the *Rudge* court concluded that Evid.R. 606(B) was not applicable, because the trial court's inquiry did not threaten or reveal discussion during deliberations. The *Rudge* court considered it proper to inquire into the partiality of jurors to determine if the defendant had received a fair trial before an impartial jury, but not to inquire into deliberations. *Id.*, 89 Ohio App.3d at 439, 624 N.E.2d at 1076. Based upon *Rudge*, the court of appeals held that Rolf Sandberg's affidavit was sufficient outside evidence for the court to have inquired of the jurors about the alleged misconduct that occurred during the trial.

{¶ 40} It is apparent from the language of Evid.R. 606(B) that the rule becomes applicable only when the validity of a verdict is questioned. Although Evid.R. 606(B) protects the deliberations process, the language of the rule does not limit its application to the examination of improper conduct or communications only during deliberations. The rule also prohibits inquiry into "the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict * * * or concerning his mental processes in connection therewith." This may involve inquiry into improper conduct that occurred throughout the trial, during the presentation of evidence, or among jurors during the course of the trial that may influence a juror's mind, emotions, or mental processes during deliberations. Events that occur during the trial may also have an effect upon the jurors' deliberations.

**{¶ 41}** Alternate jurors are selected at the same time and in the same manner as the entire jury panel. An alternate juror participates as a regular member of the jury panel and is subject to the same jury admonitions and rules until discharged. The alternate juror sees and hears the entire trial and is prepared to deliberate. An alternate juror may become a member of the deliberating panel. *State v. Hutton* (1990), 53 Ohio St.3d 36, 45, 559 N.E.2d 432, 443.

**{¶ 42}** Here, Rolf Sandberg was an alternate juror who claimed that he violated jury rules during the trial. However, he waited until after the verdict before notifying defense counsel about his conduct in an effort to challenge the finality of the verdict. When questioned by the trial judge, Rolf Sandberg admitted that he was frustrated that he had not been able to deliberate and that he was upset with the guilty verdict. Although the defense claimed that Rolf Sandberg's misconduct affected the deliberations process and tainted the verdict, the defendant presented no outside evidence of the improper conduct. This is precisely the situation that the *aliunde* rule was intended to prevent—a disgruntled juror attacking the verdict.

**{¶ 43}** Had the trial judge been notified of this conduct during the trial, the judge would have had an opportunity to inquire of the jurors about any misconduct or violation of the jury rules because the *aliunde* rule was not yet applicable. See *State v. Taylor* (1991), 73 Ohio App.3d 827, 598 N.E.2d 818. Although Rolf Sandberg did not deliberate, he was privy to the jury process up to the actual deliberations. His alleged misconduct during the trial had nothing to do with his status as an alternate juror and could just as likely have been committed by a regular juror. The defense sought to attack the final verdict based upon Rolf Sandberg's conduct during the trial prior to his discharge. Therefore, for purposes of the *aliunde* rule, one's status as an alternate juror should not preclude application of the rule. Therefore, we disapprove of the decision in *State v. Rudge* to the extent that it holds otherwise.

**{¶ 44}** When the defendant moved for acquittal or, in the alternative, a new trial, based solely on the alleged juror misconduct in Rolf Sandberg's affidavit, the trial court properly concluded that it was prohibited by Evid.R. 606(B) from considering Rolf Sandberg's affidavit or testimony for purposes of attacking the jury verdict. The court correctly disregarded the testimony of other jurors. Consequently, we reverse the judgment of the court of appeals and reinstate the judgment of the trial court with respect to the issue of juror misconduct.

**{¶ 45}** Having determined that the affidavit from the alternate juror was not competent evidence *aliunde* to challenge the jury's verdict, our resolution of this case effectively removes any conflict that may have existed with *State v. Thomas, supra,* because that case involved a juror's contact with a non-juror.

## IMMUNITY FROM PROSECUTION

**{¶ 46}** Defendant's cross-appeal challenges the validity of the trial court's grant of immunity to Susan Batt. The defendant alleges that the grant of transactional immunity pursuant to R.C. 2945.44 was unlawful because Susan Batt did not have a valid Fifth Amendment privilege against self-incrimination upon which to base the immunity. Defendant claims that, as a consequence, his rights were prejudiced. We agree.

**{¶ 47}** The Fifth Amendment declares that "[n]o person * * * shall be compelled in any criminal case to be a witness against himself * * * ." This right, or privilege, ensures that a person is not compelled to produce evidence that may tend to incriminate him. The privilege, however, is not unlimited. A person may decline to answer specific questions "only when the danger of incrimination is real and appreciable, rather than imaginary and insubstantial," or when the answer could reasonably "[furnish] a link in the chain of evidence" against him. *State v. Jenkins* (1984), 15 Ohio St.3d 164, 228, 15 OBR 311, 366, 473 N.E.2d 264, 318. See *United States v. Apfelbaum* (1980), 445 U.S. 115, 100 S.Ct. 948, 63 L.Ed.2d 250;

*Hoffman v. United States* (1951), 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118, 1124.

{¶ 48} When a witness asserts a privilege against self-incrimination, a court may not rely upon the witness's claim alone. *State v. Landrum* (1990), 53 Ohio St.3d 107, 120, 559 N.E.2d 710, 726. The court has a duty to determine if the witness's refusal to answer is justified. *Id.* If the court determines that a witness is mistaken about the danger of incrimination, then the court must require the witness to answer the question. *Hoffman v. United States*, 341 U.S. at 486, 71 S.Ct. at 818, 95 L.Ed. at 1124.

{¶ 49} However, when the court is satisfied that the witness's refusal to answer is justified, a court may either excuse the witness from testifying or, upon the written request of the prosecuting attorney, may compel the witness to answer by granting that person immunity from prosecution for any criminal act about which the person may testify. R.C. 2945.44; *State v. Kirk* (1995), 72 Ohio St.3d 564, 651 N.E.2d 981; *State ex rel. Leis v. Outcalt* (1982), 1 Ohio St.3d 147, 1 OBR 181, 438 N.E.2d 443.

{¶ 50} In this case, the trial court relied upon R.C. 2945.44. It states:

"(A) In any criminal proceeding in this state * * *, if a witness refuses to answer or produce information on the basis of his privilege against self-incrimination, the court of common pleas of the county in which the proceeding is being held, unless it finds that to do so would not further the administration of justice, shall compel the witness to answer or produce the information, if both of the following apply:

"(1) The prosecuting attorney of the county in which the proceedings are being held makes a written request to the court of common pleas to order the witness to answer or produce the information, notwithstanding his claim of privilege;

"(2) The court of common pleas informs the witness that by answering, or producing the information he will receive immunity under division (B) of this section.

"(B) If, but for this section, the witness would have been privileged to withhold an answer or any information given in any criminal proceeding, and he complies with an order under division (A) of this section compelling him to give an answer or produce any information, he shall not be prosecuted or subjected to any criminal penalty in the courts of this state for or on account of any transaction or matter concerning which, in compliance with the order, he gave an answer or produced any information."

**{¶ 51}** Transactional immunity is a prosecutorial tool to enable the government to obtain necessary testimony. *Leis*, 1 Ohio St.3d at 149, 1 OBR at 183, 438 N.E.2d at 446. The practical effect of a grant of immunity is that a witness is compelled to give information that the witness would otherwise be privileged to withhold in order to assist the prosecution. Often the witness who is compelled to testify is a co-defendant or is facing other charges related to the defendant's charges. The prosecution is willing to forgo possible prosecution of the witness by granting the witness immunity in exchange for useful testimony that will assist in convicting the defendant.

**{¶ 52}** There is no need for a grant of immunity where the witness denies all culpability. In situations where an admission of guilt by one person would completely exonerate any possible guilt of another person, as is the case here, a grant of immunity is unnecessary and improper. An assertion of the Fifth Amendment privilege by Susan Batt would lead one to believe that she possessed self-incriminating knowledge regarding her own culpability. Had Susan Batt been granted immunity and testified that she had shaken Alex and caused his death, the prosecution would have no further grounds to prosecute Matthew Reiner. To grant

immunity in such a situation may have allowed the guilty party to go free and would not "further the administration of justice."

{¶ 53} Susan Batt's counsel informed the court in advance of her testifying that she intended to assert her Fifth Amendment privilege and would refuse to answer questions. All counsel present knew that she had likewise asserted this privilege in a related juvenile court proceeding and did not answer any questions. Susan Batt's counsel explained that, although Susan Batt was not the focus of a criminal investigation, she had been with the victim within the potential time frame of the fatal trauma, she was the focus of the defense, and she did not know the identity of defense witnesses who may be called to inculpate her. Susan Batt would testify only if granted "complete and absolute immunity."

{¶ 54} The prosecution initially seemed perplexed as to why Susan Batt would refuse to testify. The prosecution said that Susan Batt had told the Children's Services Board that she had nothing to do with the victim's injuries, and her counsel had not indicated that her testimony would incriminate her. The prosecution informed the court that it had no intention of prosecuting Susan Batt. She was not being investigated and there was insufficient evidence to take to the grand jury. The prosecution even told the court, "I don't know how in the interest of justice I can request immunity for this witness because it doesn't seem to me that she in any way has anything to assert the Fifth Amendment privilege to protect herself, or I'm unaware of anything." However, when it became apparent that Susan Batt did not intend to testify, the prosecution reluctantly agreed to consider a request that the court grant Susan Batt transactional immunity, rather than request that the court use its contempt powers to force a reluctant witness to testify.

{¶ 55} When Susan Batt took the witness stand at trial and invoked her Fifth Amendment privilege, the prosecution submitted a written request asking the court to grant her immunity pursuant to R.C. 2945.44. The court conducted a hearing on whether the grant of immunity would "further the administration of justice." R.C.

2945.44. However, the court did not address the prosecution's earlier concerns that Susan Batt had no apparent reason, other than her fear of Matthew Reiner's defense, to assert the Fifth Amendment privilege. Nevertheless, the court decided that it would be in the "interests of justice" to compel Susan Batt to testify. The court granted her transactional immunity.

{¶ 56} Based on the prosecutors' statements alone, the trial judge had a duty to question Susan Batt's assertion of the privilege and whether her testimony would, as she claimed, be self-incriminating. *State v. Landrum, supra*. Instead, the trial judge merely relied upon Susan Batt's claim of privilege and disregarded the questions and concerns expressed by prosecutors. Susan Batt's testimony did not incriminate her, because she denied *any* involvement in the abuse. Thus, she did not have a valid Fifth Amendment privilege.

{¶ 57} A court may resort to R.C. 2945.44 only after reaching the threshold determination that the witness's testimony would be self-incriminating. This is apparent from the language of subsection (B) of the statute, which states that "[i]f, but for this section, the *witness would have been privileged to withhold an answer or any information given in any criminal proceeding* * * *." (Emphasis added.) We agree with the defendant that before a court may exercise its authority to grant a person transactional immunity, it is implicit that the person has validly asserted the privilege against self-incrimination. Once the issue of immunity under R.C. 2945.44 arises, it is inherent that the court has already determined that the witness has a valid privilege against self-incrimination in order to invoke immunity. Here the trial court failed to make that determination.

{¶ 58} The court of appeals below likewise recognized this threshold determination when it stated that "the language of R.C. 2945.44 implies that a trial court make some determination of the validity of the privilege against self-incrimination antecedent to a grant of statutory immunity." Nevertheless, the appellate court focused on circumstances that would have led the trial court to

18

believe that Susan Batt was not mistaken in asserting her Fifth Amendment right against self-incrimination, *i.e.*, she knew that the defense blamed her for the baby's death and she did not know what evidence, if any, the defense may have had that would implicate her in the fatal trauma. Again, these are merely Susan Batt's assertions. A defense theory is not a ground for a grant of immunity when the witness continues to deny any self-incriminating conduct. The appellate court did not consider the prosecutors' statements or the fact that Susan Batt had denied any involvement in the abuse to Alex when questioned by Children's Services Board. These are factors that could and should have been considered by the trial court in determining whether Susan Batt's fear of self-incrimination was real or imaginary.

{¶ 59} In addition, the wrongful grant of immunity resulted in serious prejudice to the defendant. The essence of Matthew Reiner's defense was that Susan Batt was responsible for Alex's death. When the court granted her immunity, the court in effect was telling the jury that Susan Batt did not cause Alex's injuries. To "further the administration of justice," the jury should have been able to hear and evaluate all the evidence to decide whether someone other than Matthew Reiner was responsible for Alex's death. A grant of immunity to Susan Batt under these circumstances seriously affected the fairness of the trial and resulted in prejudice to the defendant.

{¶ 60} The state argues that a defendant lacks standing to challenge a grant of immunity. *State v. Bika* (Oct. 19, 1978), Marion App. No. 9-78-6, unreported; *State v. Steverson* (Sept. 15, 1998), Franklin App. No. 97APA11-1466, unreported, 1998 WL 634949. This argument assumes that the grant of immunity met the statutory threshold of a valid privilege against self-incrimination. Because Susan Batt lacked a valid Fifth Amendment privilege against self-incrimination and the grant of immunity was unlawful, the state's standing argument lacks merit.

{¶ 61} The state also contends that the defendant failed to preserve any error for appeal by failing to object to the grant of immunity. We do not agree. Defense

counsel sufficiently objected to the grant of immunity when the court conducted a hearing on whether the grant of immunity would further the administration of justice.

{¶ 62} Therefore, we find that a court has no judicial discretion to grant or deny immunity until and unless the statutory requirements for immunity are met. This includes a valid assertion of one's Fifth Amendment privilege. *Leis*, 1 Ohio St.3d at 149, 1 OBR at 183, 438 N.E.2d at 446. Because Susan Batt did not have a valid Fifth Amendment privilege, the trial court's grant of immunity was erroneous and unlawful.

EVIDENTIARY ISSUES

{¶ 63} The defense contends that Dr. Patrick's theory of the cause of death was not based upon objectively verifiable facts as required by Evid.R. 702(C)(1). Therefore, it was not reliable evidence and Dr. Patrick's testimony should have been stricken. The defense relies upon the testimony of its expert witnesses who opined that the tissue slides taken by Dr. Patrick did not show the damage about which he testified.

{¶ 64} A decision to admit the testimony of an expert, once qualified, is generally within the broad discretion of the trial court and will not be disturbed absent a showing of an abuse of discretion. See *State v. Williams* (1996), 74 Ohio St.3d 569, 576, 660 N.E.2d 724, 732; *State v. Mack* (1995), 73 Ohio St.3d 502, 511, 653 N.E.2d 329, 337. An abuse of discretion requires more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *State v. Clark* (1994), 71 Ohio St.3d 466, 470, 644 N.E.2d 331, 335; *State v. Moreland* (1990), 50 Ohio St.3d 58, 61, 552 N.E.2d 894, 898; *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 173, 404 N.E.2d 144, 149.

{¶ 65} Here, the appellate court concluded that defense challenges to the reliability of the brain tissue slides concerned the weight of the evidence, not its

20

admissibility. We agree. This decision was within the broad discretion of the trial court and the court did not abuse its discretion with respect to the reliability of expert evidence within the confines of Evid.R. 702(C).

{¶ 66} The defense also contends that Dr. Balraj failed to express her opinion as to the cause of death in terms of probability. When asked her opinion "to a reasonable degree of medical certainty as to when the injury was inflicted in relationship to the collapse," Dr. Balraj stated that "the type of injuries * * * [are] consistent with the child sustaining the injury between 10:30 p.m. and 11:00 p.m." The appellate court determined that the use of the word "consistent" was not fatal to Dr. Balraj's overall testimony because she was answering a hypothetical question predicated upon the appropriate standard of medical certainty. In addition, her testimony was cumulative. Looking at the overall context of her testimony, we agree that the trial court did not abuse its discretion when it refused to strike the testimony of Dr. Balraj for failure to include the word "probable" in her opinion.

{¶ 67} The defense claims that the trial court should have admitted the grand jury testimony of Dr. Patrick as a prior inconsistent statement under Evid.R. 613(B). The defense contended that the opinion offered by Dr. Patrick before the grand jury as to the cause of death was different from the opinion that he rendered at trial. The trial court permitted the defense to cross-examine Dr. Patrick about a particular statement he had made to the grand jury. Dr. Patrick initially disagreed with statement but, after reviewing his grand jury transcript, he subsequently said that he recalled making the statement, although he attempted to qualify his answer and put it into context with the remainder of his grand jury testimony. The statement alone could appear to be inconsistent.

{¶ 68} The defense moved to introduce into evidence the one page from the transcript of Dr. Patrick's grand jury testimony that contained the alleged inconsistent statement. The court said it would admit the entire transcript from the

grand jury in order to put the alleged inconsistency into context; however, the defense would not agree. Therefore, the court excluded the one-page exhibit.

{¶ 69} Evid.R. 613(B)(1) states, in part, that extrinsic evidence of a prior inconsistent statement is admissible "[i]f the statement is offered solely for the purpose of impeaching the witness, the witness is afforded a prior opportunity to explain or deny the statement and the opposite party is afforded an opportunity to interrogate the witness on the statement or the interests of justice otherwise require."

{¶ 70} Although the defense fulfilled the requirements of Evid.R. 613(B) , we agree with the reasoning of the trial court that it would have been improper to admit only one page of Dr. Patrick's grand jury testimony because it would not fairly and accurately represent his testimony to the grand jury. The trial court acted within its discretion to exclude the exhibit when defense counsel would not agree to admission of the entire transcript. Evid.R. 106.

CONCLUSION

{¶ 71} For the foregoing reasons, we reverse the judgment of the court of appeals with respect to the juror misconduct and the grant of immunity to Susan Batt, and we affirm the remainder of the court's judgment. This cause is remanded to the trial court for a new trial consistent with this opinion.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

WOLFF, F.E. SWEENEY and PFEIFER, JJ., concur.

DOUGLAS, J., concurs separately.

MOYER, C.J., dissents.

COOK, J., concurs in part and dissents in part.

WILLIAM H. WOLFF, JR., J., of the Second Appellate District, sitting for RESNICK, J.

_____

**DOUGLAS, J., concurring.**

{¶ 72} I concur with the ultimate judgment of the majority in remanding this cause to the trial court for a new trial. I write separately to specifically concur in the majority's opinion with regard to the immunity issue and the discussion of the issue found in the "Immunity From Prosecution" section of the opinion. I also write because I agree, with regard to the juror misconduct issue, with the analysis found in Chief Justice Moyer's dissenting opinion.

_____

**MOYER, C.J., dissenting.**

{¶ 73} I concur in the decision of the majority with respect to the grant of immunity to Susan Batt, and the evidentiary issues presented by the defense. However, I respectfully dissent from the decision of the majority holding that evidence received from an alternate juror who did not participate in deliberations is

insufficient *aliunde* evidence under Evid. R. 606(B) to inquire into the validity of the verdict. While I recognize that allowing a party to question a jury verdict based on evidence presented by an alternate juror may have some detrimental consequences, I believe that the integrity of the jury process would be better preserved by allowing such inquiries.

{¶ 74} Evid.R. 606(B) provides:

"Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement *occurring during the course of the jury's deliberations* or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith. A juror may testify * * * only after some outside evidence of that act or event has been presented." (Emphasis added.)

{¶ 75} The majority correctly observes that Evid.R. 606(B) is intended to preserve the integrity of the jury process and the privacy of deliberations. Significantly, the rule prohibits testimony about events and statements occurring *during the course of deliberations*, absent some outside evidence of such occurrences. The rule does go further to prohibit inquiry into "the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict * * * or concerning his mental processes in connection therewith." The majority relies on this additional language to conclude that testimony of an alternate juror is insufficient outside evidence to inquire into the validity of a jury verdict. However, the inclusion of the words "during the course of deliberations" in the first sentence of the rule indicates that Evid.R. 606(B) is meant to protect the deliberation process. Therefore, it follows that an alternate juror, who did not participate in deliberations, could properly supply the evidence necessary to inquire into the validity of the verdict reached by the jury.

24

**{¶ 76}** The majority also concluded that the *aliunde* rule is not applicable during the trial. Instead, the rule applies only after the jury decides on a verdict. This fact further supports allowing an alternate juror, who did not participate in deliberations, to supply the evidence necessary to challenge a jury verdict pursuant to Evid.R. 606(B).

**{¶ 77}** While I share the concern of the majority that allowing an alternate juror to provide the evidence needed to inquire into a jury's verdict could easily allow a single disgruntled alternate juror to attack a jury verdict, I believe that this risk is outweighed by the right of the parties to a jury free of misconduct. Section 5, Article I of the Ohio Constitution guarantees the right to a trial by jury, and this right carries with it by necessary implication the right to a trial by a jury of unbiased and unprejudiced jurors. *Lingafelter v. Moore* (1917), 95 Ohio St. 384, 117 N.E. 16.

**{¶ 78}** Here, the appellate court found that there had been juror misconduct during the trial and that such misconduct was prejudicial to the defendant. I agree with the court of appeals that Evid.R. 606(B) should be interpreted to allow testimony of an alternate juror as sufficient *aliunde* evidence to inquire into the validity of a jury verdict.

**{¶ 79}** For these reasons, I would affirm the judgment of the court of appeals with respect to the issue of juror misconduct.

————————————

**COOK, J., concurring in part and dissenting in part.**

I. *Aliunde* Evidence/Juror Misconduct

**{¶ 80}** The majority's syllabus suggests that an alternate juror's testimony can never be sufficient "outside evidence" under Evid.R. 606(B) to permit jurors to testify regarding extraneous prejudicial information. Like Chief Justice Moyer, I am not convinced that a discharged alternate juror's *status*—the status of having once served as an alternate juror—should in every case preclude the trial court from

relying on that individual's testimony to trigger an inquiry into the validity of a verdict.

**{¶ 81}** Under Civ.R. 47(C), "[a]n alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict." A discharged alternate juror thus no longer possesses "the same functions, powers, facilities, and privileges as the regular jurors." *Id.* A discharged alternate juror is thus no longer a "juror" for purposes of the Civil Rules. And I see no compelling reason to treat a discharged alternate juror as a "juror" under the *aliunde* rule either, since this evidentiary rule is designed to protect the sanctity of the deliberative process—a process in which the discharged alternate juror did not participate. Accord *State v. Rudge* (1993), 89 Ohio App.3d 429, 437, 624 N.E.2d 1069, 1074 ("[A]lternate jurors who are not present during deliberations and do not participate in rendering the verdict are not members of the trial jury for purposes of the *aliunde* rule").

**{¶ 82}** Though the trial court in this case ultimately rejected *Rudge* and concluded that it could not use the alternate's affidavit as the basis to examine the jurors, the trial court also determined that *even if* the alternate's affidavit satisfied the *aliunde* rule, the juror examination revealed that Reiner suffered no prejudice. We review the trial court's decision denying Reiner's motion for a new trial on an abuse-of-discretion standard. *State v. Schiebel* (1990), 55 Ohio St.3d 71, 564 N.E.2d 54, paragraph one of the syllabus. Without mentioning this deferential standard of review, the majority of the court of appeals concluded that what occurred was "by definition * * * prejudicial" to Reiner. The dissenting judge on the appellate panel noted that Reiner bore the burden of proving that any unauthorized communications with jurors resulted in actual juror partiality, and concluded that Reiner failed to meet his burden. I agree. As the trial judge stated, all of the jurors "uniformly denied" that any improper communication with the alternate juror affected their verdict.

{¶ 83} Accordingly, like the majority, I would reverse the judgment of the court of appeals and reinstate the judgment of the trial court denying Reiner's motion for a new trial on the basis of juror misconduct. However, I do not join the majority's syllabus, because I share Chief Justice Moyer's view that the testimony of a discharged alternate juror is not categorically insufficient *aliunde* evidence for purposes of Evid.R. 606(B).

## II. The Grant of Immunity to Susan Batt

{¶ 84} I dissent from the majority's resolution of the immunity issue. The majority concludes that the trial court's grant of immunity to Susan Batt was unlawful for two reasons. First, the majority concludes that Batt did not have a valid Fifth Amendment privilege against self-incrimination. Second, the majority decides that the grant of immunity that followed from this apparently invalid privilege resulted in "serious prejudice" to Reiner. I respectfully disagree on both counts.

### A. Batt's Entitlement to the Fifth Amendment Privilege

{¶ 85} I agree with the majority that the Fifth Amendment privilege against self-incrimination is "confined to instances where the witness has *reasonable cause* to apprehend danger from a direct answer." (Emphasis added.) *Hoffman v. United States* (1951), 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118, 1124. But the majority applies an inapposite test for "reasonable cause," deciding that "Susan Batt's testimony did not incriminate her because she denied *any* involvement in the abuse."

{¶ 86} A witness's denial of culpability regarding an offense should not preclude the witness from asserting the privilege against self-incrimination. "The privilege afforded not only extends to answers that would in themselves support a conviction * * * but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant * * * ." *Id.* There are many situations in which a witness could deny guilt but could nonetheless furnish a self-

27

incriminating "link in the chain" if compelled to answer a particular question in court. Witnesses who deny ultimate culpability for the defendant's alleged offense should not be categorically denied access to the Fifth Amendment privilege.

{¶ 87} The *Hoffman* case cited by the majority reinforces my view that the "reasonable cause" standard for asserting the privilege is not as the majority opinion suggests. In *Hoffman*, the United States Supreme Court noted that, "if the witness, upon interposing his claim [of privilege], were required to prove the hazard [of incrimination] in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee. To sustain the privilege, it need *only* be evident from the *implications* of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered *might* be dangerous because injurious disclosure *could* result. *The trial judge in appraising the claim 'must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence.*' " (Emphasis added.) *Id.*, 341 U.S. at 486-487, 71 S.Ct. at 818, 95 L.Ed. at 1124, quoting *Ex parte Irvine* (S.D.Ohio 1896), 74 F. 954, 960.

{¶ 88} In the case at bar, Batt had "reasonable cause" to assert the privilege against self-incrimination. Defense counsel's announced theory of the case was that Batt, not Reiner, was responsible not only for the alleged crime against Alex, but also for the uncharged injuries suffered by Alex's sibling. Given this, and given the statements by defense counsel warning the trial court that a grant of immunity would preclude a later trial against Batt for Alex's death, I agree with the trial court and the court of appeals that Batt's assertion of the Fifth Amendment privilege was amply supported by the "reasonable cause" *Hoffman* requires.

### B. The Trial Court's Grant of Immunity

{¶ 89} Having rejected Batt's entitlement to the privilege against self-incrimination, the majority also concludes that "the wrongful grant of immunity resulted in serious prejudice to the defendant." To support this conclusion, the majority claims that, "when the court granted her immunity, *the court in effect was telling the jury that Susan Batt did not cause Alex's injuries*." (Emphasis added.)

{¶ 90} Since the trial court's decision to grant or deny immunity under R.C. 2945.44 is reviewable only for an abuse of discretion, *State ex rel. Ney v. Niehaus* (1987), 33 Ohio St.3d 118, 119, 515 N.E.2d 914, 916, I would not reverse that decision on such speculative grounds. The majority claims that the grant of immunity "told" the jury that Batt was faultless. It is equally possible—if not more likely—that the jury would regard Batt as *less* credible, and a *more likely source* of Alex's injuries, after the trial court's grant of immunity. After all, a grant of immunity compels testimony from a witness who has something potentially *self-incriminating* to say. R.C. 2945.44(A). Regardless, I would not substitute this court's judgment for the trial court's on the basis of such speculation.

{¶ 91} The majority also decides that, to further the administration of justice, "the jury should have been able to hear and evaluate *all* the evidence to decide whether someone other than Matthew Reiner was responsible for Alex's death." (Emphasis added.) I agree, but I fail to see how the trial court's grant of immunity to Batt here did anything to restrict the trial evidence. The jury heard Batt's immunized testimony. The trial court's grant of immunity did not immunize Batt from testifying—it "compel[led] the witness to answer." R.C. 2945.44(A).

{¶ 92} Batt had reasonable cause to assert her Fifth Amendment privilege. The trial court did not abuse its discretion or prejudice Reiner in deciding to grant Batt transactional immunity in compliance with R.C. 2945.44. Accordingly, I dissent from the majority's conclusion that the trial court's grant of immunity was erroneous, and would affirm the court of appeals' decision on this issue.

_____