OPINION
Jennifer Ruth, David Ruth, and Jonathan Ruth (hereinafter collectively referred to as "the Ruths") appeal from a jury verdict in the Montgomery County Court of Common Pleas, which found for the defendants, Hugh Moncrief, M.D., Eduardo Casalmir, M.D., and their corporate employers.
Jennifer was diagnosed with a prolactin-secreting microadenoma of the pituitary gland (a prolactinoma) in 1994 after she sought treatment for pregnancy-like symptoms such as absence of menstrual periods, leakage of breast milk, and weight gain. During the months following her diagnosis, she was referred to several doctors until she saw an endocrinologist who prescribed Parlodel to treat her symptoms. After eighteen months, Jennifer's doctor told her to stop taking the medication because it made her sick. After the passage of an additional eighteen months, Jennifer saw Dr. Moncrief in November 1997. He recommended surgery to remove her microadenoma, and Jennifer elected to have the surgery.
Dr. Moncrief performed a transphenoidal resection of Jennifer's microandenoma on January 8, 1998. Jennifer had no problems for the first three days following the operation. On the morning of January 12, 1998, however, she began to experience severe headaches, shortness of breath, and reduced mental and physical activity. The hospital gave her pain medications and sedatives. Dr. Casalmir first saw Jennifer on the morning of January 12, at Dr. Moncrief's request. He ordered a chest x-ray and blood work. When Jennifer's condition improved by the morning of January 13, Dr. Casalmir concluded that she had experienced a reaction to her medication.
By the evening of January 14, Jennifer displayed symptoms of bacterial meningitis and vision loss. At Dr. Moncrief's order, Jennifer was given a CT scan and a lumbar puncture, which showed that she did have meningitis. She was given antibiotics to treat the meningitis, but her vision loss was permanent. Jennifer lost all vision in her left eye and three quarters of the vision in her right eye.
Jennifer, her husband David, and her son Jonathon filed a complaint in the court of common pleas on October 2, 1998 against Dr. Moncrief and Dr. Casalmir, their corporate employers, an endocrinologist, and the hospital. The claims against the latter two defendants were ultimately dismissed following a settlement. The complaint stated claims against the doctors and their employers for negligence in the diagnosis, care, and treatment of Jennifer and for loss of consortium of Jennifer's husband and child. On November 4, 1999, the Ruths filed an amended complaint adding a claim for failure to obtain informed consent.
A jury trial of the case commenced on April 17, 2000. To rebut the Ruths' claim that Jennifer was not an appropriate candidate for the surgery that he had performed, Dr. Moncrief prepared a large binder of medical records documenting her symptoms for the three years preceding the surgery. Both doctors then referred to the records throughout the trial. However, the records were used primarily by Dr. Moncrief to impeach the testimony of the Ruths' expert, who testified that Jennifer had not had the symptoms that would have indicated that she was an appropriate candidate for surgery. Confronted on cross examination with years of records listing the symptoms he thought necessary, the Ruths' expert eventually agreed that Jennifer had had a prolactinoma. The Ruths' attorney repeatedly objected to the use of these records, both before and during trial, on the grounds that they were hearsay and not within the exception for business records. The trial court allowed the use of the records at trial and eventually admitted most of them as exhibits.
The case was submitted to the jury on May 2, 2000. Prior to the completion of deliberations, a juror, Mary Lou Maus, fled the jury room and the courthouse in an emotional state, indicating only that "she was just too upset with the other jurors * * * and she was not going to stay and didn't want to talk to anyone." The trial judge then met with counsel for all parties, who unanimously decided to go forward with only seven jurors. The parties rejected the possibilities of mistrial and of recalling an alternate juror. The jury returned a verdict for the defendants, signed by six of the seven jurors as required.
After procuring affidavits from Maus, the juror who fled, and Johanna Hoak, an alternate juror, the Ruths filed a motion requesting a mistrial on the basis of juror misconduct. The affidavits stated that some of the jurors had formed a "clique," discussed the case repeatedly during trial, made decisions before the case was submitted to them, bullied other jurors, and refused to discuss the merits of the Ruths' case in deliberations. The affidavits further stated that several jurors had expressed frustration with the length of the trial. The trial judge denied the Ruths' motion, noting that the aliunde rule of Evid.R. 606(B) prohibited him from considering the testimony of the juror and alternate juror absent some external evidence of misconduct.
The Ruths raise two assignments of error on appeal.
 THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN ADMITTING INTO EVIDENCE A THICK NOTEBOOK OF HEARSAY MEDICAL RECORDS, INCLUDING REPORTS, OPINIONS, DIAGNOSES AND NUMEROUS OTHER INCOMPETENT AND IRRELEVANT DOCUMENTS.
Under this assignment of error, the Ruths argue that the medical records submitted as exhibits by Dr. Moncrief do not fall within the business records exception to the hearsay rule, Evid.R. 803(6), because they contain opinions and diagnoses, which are excluded by the Ohio rule. Both sides appear to agree that much of the information contained in the records was admissible under the Evid.R. 803(4) exception for statements made for the purposes of medical diagnosis or treatment. However, the trial court allowed the remaining information in the records to come in under Evid.R. 803(6), and it is this decision that the Ruths challenge under this assignment of error.
Initially, we must address Dr. Moncrief's argument that the Ruths stipulated to the use of the records by stipulating to their authenticity. Dr. Moncrief argues that the Ruths did not limit their stipulation to authenticity under Evid.R. 901(A); therefore, he assumed that the Ruths were also stipulating to authenticity under Evid.R. 803(6). We believe that the Ruths' stipulation to the authenticity of the medical records constituted a waiver of the foundational requirements of Evid.R. 803(6) but did not waive their hearsay objection to the admission of the records. Therefore, we will move straight to the essence of the Ruths' argument, that Evid.R. 803(6) does not allow the admission of medical opinions and diagnoses.
Evid.R. 803(6) provides the following exception to the general rule that hearsay is inadmissible:
 A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or as provided by Rule 901(B)(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.
The Staff Notes to this rule note that:
 The Ohio rule departs from the Federal Evidence rule by deleting "opinions and diagnoses" as admissible under the section. It is not clear how far present Ohio law permits such evidence to be admitted. In Hytha v. Schwendeman (1974), 40 Ohio App.2d 478, the Franklin County Court of Appeals set forth seven criteria for a diagnosis to be admissible when contained in a hospital record. The Hytha case may retain validity in so far as it may assist in determining the point at which, in medical records, an act, event or condition admissible under the exception becomes an impermissible opinion or diagnosis under the rule.
The great weight of authority in Ohio holds that medical opinions and diagnoses are not within the hearsay exception of Evid.R. 803(6). See,e.g., Meyers v. Hot Bagels Factory, Inc. (1999), 131 Ohio App.3d 82, 101
(First District); Hytha v. Schwendeman (1974), 40 Ohio App.2d 478, syllabus (Tenth District); Bush v. Burchett (June 13, 1995), Athens App. No. 94CA2237, unreported, at *3-4 (Fourth District). This court has noted that the admissibility of diagnoses and opinions under Evid.R. 803(6) is unclear and has applied Hytha to determine such admissibility. See Druryv. Jones (Nov. 14, 1988), Miami App. No. 87-CA-56, at *9. We agree with these cases that medical opinions and diagnoses are not admissible under the Ohio version of Evid.R. 803(6) unless the seven criteria set forth inHytha are present. Under Hytha, the following factors must exist before a diagnosis can be admitted:
 (1) The record must have been a systematic entry kept in the records of the hospital or physician and made in the regular course of business;
 (2) The diagnosis must have been the result of well-known and accepted objective testing and examining practices and procedures which are not of such a technical nature as to require cross-examination;
 (3) The diagnosis must not have rested solely upon the subjective complaints of the patient;
(4) The diagnosis must have been made by a qualified person;
 (5) The evidence sought to be introduced must be competent and relevant;
 (6) If the use of the record is for the purpose of proving the truth of the matter asserted at trial, it must be the product of the party seeking its admission;
(7) It must be properly authenticated.
Hytha, supra. The Ruths' stipulation to the authenticity of the records establishes the first and seventh factor; however, several of the remaining factors are not discernable from the record before us. Therefore, to the extent the trial court admitted medical records containing opinions and diagnoses, it erred in doing so. However, we must now address whether the Ruths were prejudiced by this error.
We find that the trial court's error in permitting the use of, and admitting, the medical records without redacting opinions and diagnoses was prejudicial to the Ruths. Dr. Moncrief and Dr. Casalmir argue that any error by the trial court in admitting the records was harmless because Jennifer testified on both direct and cross examination regarding the diagnoses and opinions in the medical records. However, Jennifer's testimony regarding what her doctors told her is clearly not the equivalent of the doctors' notes, letters, and charts detailing their thoughts and opinions regarding her medical treatment. Jennifer clearly could not testify regarding her doctor's thoughts and opinions that were not conveyed to her. Furthermore, the medical records likely bore a gloss of credibility that Jennifer's testimony could not match, especially considering that the doctors themselves were not present for the attorneys to examine and for the jury to evaluate. Therefore, we conclude that the trial court erred in admitting the opinions and diagnoses contained in the medical records and that the error was not harmless.
The first assignment of error is sustained.
 THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN REFUSING TO GRANT A NEW TRIAL UPON DISCOVERY OF EVIDENCE OF CLEAR JUROR MISCONDUCT.
Under this assignment of error, the Ruths argue that the trial court should have granted their motion for a mistrial due to juror misconduct. They based their motion on the affidavits of juror Maus and alternate juror Hoak, which alleged that members of the jury engaged in rampant misconduct by discussing the case and forming opinions before it was submitted to them, by complaining about the length of the trial, and by refusing to discuss the evidence during deliberations. The trial court overruled the Ruths' motion, noting that it was prohibited from considering the affidavits by Evid.R. 606(B), which contains the aliunde
rule.
The granting or refusing of a motion for a new trial rests largely within the sound discretion of the trial court and that court's ruling on such motion shall not be disturbed by an appellate court absent a showing that the trial court abused its discretion. See Yungwirth v. McAvoy
(1972), 32 Ohio St.2d 285, 286.
Evid.R. 606(B) provides:
 Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith. A juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear on any juror, only after some outside evidence of that act or event has been presented. However a juror may testify without the presentation of any outside evidence concerning any threat, any bribe, any attempted threat or bribe, or any improprieties of any officer of the court. His affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying will not be received for these purposes.
(Emphasis added.)
The Ruths seek to circumvent application of this rule in three ways. First, they argue that Maus' flight from the courthouse constituted outside evidence as required by the rule. Second, they argue that Hoak's affidavit should be considered because alternate jurors are not jurors for the purposes of the rule. Third, they argue that the evidence of misconduct before deliberations should be considered because the rule only applies to testimony regarding events during deliberations.
All three of the Ruths' arguments are without merit. First, we do not believe that the trial court abused its discretion in finding that the flight of Maus from the courthouse did not constitute outside evidence of misconduct as required by the rule. Maus did not stop to tell the bailiff why she was leaving and could have had any number of reasons for doing so. Furthermore, we must note that the Ruths' attorney agreed to proceed with only seven jurors rather than requesting a mistrial, which he presumably would have done had Maus' leaving been per se evidence of juror misconduct. Second, the Supreme Court of Ohio has held that the prohibitions of Evid.R. 606(B) do apply to alternate jurors. See State v.Reiner (2000), 89 Ohio St.3d 342, 351-52, reversed on other grounds532 U.S. 17, 121 S.Ct. 1252. Third, Reiner also holds that Evid.R. 606(B) is not limited in application to improper conduct during deliberations but also prohibits inquiry into "the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict * * * or concerning his mental processes in connection therewith." This may involve inquiry into improper conduct that occurred throughout the trial, during the presentation of evidence, or among jurors during the course of the trial that may influence a juror's mind, emotions, or mental processes during deliberations. Events that occur during the trial may also have an effect upon the juror's deliberations.
Id. at 351, citing Evid.R. 606(B). For the above reasons, we cannot find that the trial court erred in refusing to grant a new trial on the basis of juror misconduct.
The second assignment of error is overruled.
The judgment of the trial court will be reversed and remanded for a new trial.
FAIN, J. and GRADY, J., concur.