OPINION
Defendant-appellant Christopher Scott appeals from his convictions of aggravated murder and attempted aggravated murder and the sentences thereon which were entered after a jury trial in the Mahoning County Common Pleas Court. Scott sets forth seven assignments of error. For the following reasons, appellant's first, fourth, fifth, sixth and seventh assignments of error are overruled. His second assignment of error (dealing with sentencing) and his third assignment of error (dealing with the exclusion of testimony) have merit. Accordingly, this case is reversed and remanded for further proceedings consistent with this opinion.
 STATEMENT OF FACTS
Around midnight on January 18, 1997, Lori Townsend and Albert Byrd were walking to the store when they were spotted by appellant and his friend Kendrick Mickel. After the four exchanged shouts to determine who was approaching, Christopher Scott and Kendrick Mickel started walking toward Lori Townsend and Albert Byrd. The couple attempted to flee by entering an approaching automobile. A shot was fired into the vehicle. Lori Townsend died from a gunshot wound to the face. Albert Byrd named Scott as the shooter.
Scott was indicted for the aggravated murder of Lori Townsend with a firearm specification. Thereafter, a superseding indictment was filed which added a charge for the attempted aggravated murder of Albert Byrd and a firearm specification. The state proceeded on the theory that Scott's intent to kill Albert Byrd was transferred to Lori Townsend. However, Scott testified that Kendrick Mickel shot Lori Townsend after Scott tried to talk him out of shooting Albert Byrd. Apparently, Kendrick Mickel had been arrested for complicity but then released. Upon taking the stand, Kendrick Mickel invoked his privilege against self-incrimination under the Fifth Amendment and refused to testify.
The jury heard the case and returned guilty verdicts on both charges and specifications on November 28, 1997. On December 2, 1997, the court sentenced Scott to three years of actual incarceration on the merged firearm specifications, life with possibility of parole after twenty years for the aggravated murder and a consecutive sentence of ten years for the attempted aggravated murder.
On December 11, 1997, Scott filed a motion for a new trial which was denied. Thereafter, he filed timely notice of appeal; however, he labeled it as a motion for new trial. The label on the notice of appeal was later corrected, and we allowed the appeal to proceed. Scott filed his brief in September 2000, and the state filed its response in December 2000.
 ASSIGNMENT OF ERROR NUMBER ONE
Scott sets forth seven assignments of error, the first of which provides:
 "THE TRIAL COURT ERRED BY ENTERING A JUDGMENT OF CONVICTION FOR BOTH COUNT ONE (AGGRAVATED MURDER) AND COUNT TWO (ATTEMPTED AGGRAVATED MURDER) WHERE CONVICTIONS ON BOTH OFFENSES IS CONTRARY TO OHIO REVISED CODE ANN. § 2941.25(A)."
Scott contends that even if he were the shooter, his conviction and sentence for the attempted aggravated murder should be reversed as a matter of law based upon R.C. 2941.25. In essence, the question may be simply stated, as follows: If a person fires one shot intending to hit "A," but the bullet strikes "B," can the shooter be convicted of intending to shoot both parties with the same shot ("B" under the theory of his actual intent, and "A" under the theory of transferred intent)?
However, the state initially contends that this court should not address this argument because Scott waived it by failing to raise it to the trial court, citing State v. Comen (1990), 50 Ohio St.3d 206, 211. InComen, the Supreme Court stated that it need not address arguments relating to R.C. 2941.25 because, although the appellate court addressed them, they were not raised at the trial level. Id., citing State v.Broom (1988), 40 Ohio St.3d 277. As noted in Broom, the reviewing court may review for plain error affecting substantial rights even where an argument regarding R.C. 2941.25 was not raised before the trial court.Id. at 281, 290 (where the Supreme court addressed the issue even where it was not raised below); Crim.R. 52(B). Here, if Scott's argument is correct, his conviction of attempted aggravated murder with a firearm specification would be reversed as a matter of law and his sentence decreased by ten years. As such, it would be difficult for this court to conclude that the error now claimed did not adversely impact the substantial rights of Scott.
Moreover, although the gist of the argument may not have been explicit, defense counsel moved for a directed verdict on attempted aggravated murder noting that only one shot was fired, that the state argues transferred intent, and that the state "cannot have it both ways." (Tr. 310). Therefore, we shall fully analyze this assignment of error.
The relevant statute, R.C. 2941.25, which is the multiple count statute, provides as follows:
 "(A) Where the same conduct by defendant can be construed to constitute two or more offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
 (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."
Scott argues that the crimes were not committed separately and that he had the same animus for both victims. Some courts have held that the act of firing a gun into a group of people in order to hit one specific target carries with it a separate animus for each person shot or nearly shot. The Eighth District seemed to adopt this rule and then disallowed convictions for multiple offenses where there was no evidence that the defendant was aware of the presence of bystanders and where the bystanders were not injured. State v. Cartellone (1981), 3 Ohio App.3d 145. The Eleventh District stated that a defendant could be convicted of attempted aggravated murder of the police officer whom he intended to kill and felonious assault of the officer who he actually shot as it could be inferred that he was aware of the presence of other officers and thus had a separate animus for each offense. State v. Williams (1996),115 Ohio App.3d 24.
Because the case at bar, which alleged the specific intent of purposely with prior calculation and design, proceeded on the theory of transferred intent, it is distinguishable from these cases which used actual intent for each victim. Hence, our inquiry does not end here but requires analysis of the transferred intent doctrine.
The doctrine of transferred intent is a theory of imputed liability used in cases such as the "bad aim" case.[1] By using this doctrine in cases such as the one at bar, the offender's intent to purposely kill the intended victim with prior calculation and design may be transferred to the actual victim who dies as a result of the bullet meant for the intended victim. Because the offender's intent is transferred, his animus or intent is the same as to both victims. Thus, Scott correctly argues that he did not possess a separate animus for both victims.
However, even if the crimes were not committed separately or with a separate animus, if the crimes are not allied offenses of similar import, then the defendant can still be convicted of both. R.C. 2941.25(A) and (B); State v. Rance (1999), 85 Ohio St.3d 632, 636. In other words, under the multiple-count statute, a defendant can be convicted and punished for multiple offenses of dissimilar import although committed with the same animus. Id. Offenses of dissimilar import are those for which the elements of each do not correspond to such a degree that the commission of one crime will result in the commission of the other. Id. at 636-638. Conversely, allied offenses of similar import are those for which the elements of each correspond to such a degree that the commission of one will result in the commission of the other crime. Id.
Where there is one victim in a shooting, the elements of aggravated murder and attempted aggravated murder correspond to such a degree that the defendant cannot be convicted of both. However, where there is an attempt to kill one victim and an actual killing of another victim, the crimes do not so correspond. This is because the commission of attempted aggravated murder of one victim will not necessarily result in the aggravated murder of another victim and vice versa.
In State v. Jones (1985), 18 Ohio St.3d 116, the Supreme Court held that a defendant may be convicted of a separate violation of the statute defining aggravated vehicular homicide for each person killed as the result of a single instance of that defendant's reckless operation of his vehicle. The Court explained that the defendant's conduct represented offenses of dissimilar import, the import being each person killed. Id. at 118. See, also, State v. Chafin (June 13, 2000), Franklin App. No. 99AP1071, unreported (stating that a defendant can be convicted of one count of felonious assault for each person in the vehicle).
Relying on Jones, the Third Appellate District found that each of three felonious assault convictions were of dissimilar import where the defendant fired into a car holding three people even where the defendant only had one actual target. State v. Phadphom (Sept. 19, 1996), Crawford App. No. 3-96-11, unreported. The Tenth District held that a defendant could be convicted of two felonious assaults where he fired into a residence to shoot one person but injured two people because dissimilar import exists for each person affected by the conduct. State v. Miller
(June 15, 1995), Franklin App. No. 94APA10-1458, citing Jones and the Eighth District's case of State v. Phillips (1991), 75 Ohio App.3d 785
(which held that because the legislature defines crimes such as felonious assault in terms of harm done to "another," there is a dissimilar import with respect to each person subjected to the harm or risk of harm). Similarly, the Eleventh District found that a defendant could be convicted of aggravated murder and two counts of attempted aggravated murder where he shot into a group in order to hit a person who did not get shot. State v. Harvey (May 2, 1997), Lake App. No. 95-L-192, unreported.
Under this analysis, where a defendant commits a single act and is charged with two offenses each which concern a different victim, the offenses are not allied offenses of similar import but are offenses of dissimilar import. As such, Scott was properly convicted and sentenced for both the aggravated murder of Ms. Townsend and the attempted aggravated murder of Mr. Byrd. Therefore, this assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER TWO
Appellant's second assignment of error contends:
 "THE TRIAL COURT ERRED WHEN IT SENTENCED APPELLANT TO THE MAXIMUM ALLOWABLE PRISON TERM FOR ATTEMPTED AGGRAVATED MURDER UNDER THE SENTENCING GUIDELINES BECAUSE SUCH SENTENCE WAS NOT SUPPORTED BY THE RECORD AND BECAUSE THE COURT FAILED TO MAKE REQUISITE FINDINGS."
The court sentenced Scott to: (a) three years of actual incarceration on the two merged gun specifications; (b) a statutorily set sentence of life with a possibility of parole after twenty years on the aggravated murder conviction; and (c) a consecutive sentence of ten years on the attempted aggravated murder conviction. Ten years is the maximum sentence for attempted aggravated murder, a first degree felony. See R.C.2929.14(A)(1) (listing the available sentences for a first degree felony as three, four, five, six, seven, eight, nine, or ten years).
When imposing a sentence for a felony, the court must impose the minimum sentence if the offender has not previously served a prison term unless the court finds on the record that the minimum sentence will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime. R.C. 2929.14(B). Although the court need not state its reasoning when it deviates from the minimum sentence, the record must reflect that the court found either or both of the aforementioned criteria. State v. Edmonson (1999), 86 Ohio St.3d 324,326.
An exception to the rule requiring findings to vary from the minimum exists if the court properly imposed the maximum sentence. See R.C.2929.14(B) (which begins with "[e]xcept as provided in division (C)"). Absent certain circumstances not relevant herein, the court may impose the maximum sentence for a felony only upon offenders who committed the worst forms of the offense, upon offenders who pose the greatest likelihood of committing future crimes, upon certain major drug offenders, and upon certain repeat violent offenders. R.C. 2929.14(C). When imposing a maximum sentence, the court's finding that the offender fits into one of these categories must be supported by its reasoning. R.C. 2929.19 (B)(2)(d). See, also, Edmonson, 86 Ohio St.3d at 328.
Appellant argues that since he has not previously served a prior prison term, the court erred by failing to find on the record either of the two criteria for varying from the minimum sentence. Appellant also contends that the court erred in sentencing him to the maximum without making the requisite findings and setting forth the reasons for the findings.
The state counters that the sentencing hearing and sentencing entry reflect the court's concern for the nature of the offense and for protecting the public. The state points to the following statements by the court contained in the sentencing transcript: "Carrying guns and using drugs continues to chip away at our civilization * * * We'll not stand by and allow people to hold us hostage in our own houses by virtue of people carrying weapons and having drugs on the street." The state also points to the sentencing entry which lists the following justifications for the attempted aggravated murder sentence: "that the victim suffered serious psychological harm; that the Defendant showed no genuine remorse; that recidivism is likely given the Defendant's history of drug trafficking and use of weapons."
In Edmonson, the trial court stated at sentencing, "I find you to be a very dangerous offender and you to commit a crime again [sic]. This was a terrible incident with a person who has [sic] a gun, robbing people."Id. at 327. That court's judgment entry stated, "[Edmonson] is a dangerous offender, that recidivism is likely, and that a gun was used during this incident." Id. at 327-328. The Supreme Court held that although one or more of the remarks by the trial court might be argued to support a finding that the minimum sentence would demean the seriousness of the offender's conduct or that the public would not be adequately protected, the trial court did not specify either of the reasons listed in R.C. 2929.14(B) as supporting its deviation from the minimum sentence.Id. at 328. The Supreme Court also found that the sentencing failed to reflect a finding that Edmonson fit within one of R.C. 2929.14(C)'s categories of offenders upon whom the maximum can be imposed. Id. at 329. Hence, the Court vacated Edmonson's sentence and remanded for resentencing.
The insufficient language used by the trial court in Edmonson is very similar to that used by the trial court in the case at bar. As for varying from the minimum, the trial court failed to specify that the shortest sentence would demean the seriousness of the offense or would not adequately protect the public. Following the holding of Edmonson, even if some remarks may be construed to support a finding that the minimum would demean the seriousness of the offense or would not protect the public, without a specific finding, the sentencing guidelines have been violated.
The same rationale applies to the court's imposition of the maximum sentence. Appellant was not convicted of a drug offense nor was he found to be a repeat violent offender. The court did not find that appellant committed the worst form of the offense. The court did find that recidivism was likely and gave reasons for this finding. However, theEdmonson holding demonstrates that merely stating that recidivism is likely is not the same as stating that the offender should be sentenced to the maximum because he poses the "greatest likelihood" of committing future crimes. Id. at 328-329.
For these reasons, the court's variance from the minimum sentence without making the requisite finding on the record was contrary to law in light of the fact that the court's imposition of the maximum sentence was not supported by the proper findings and reasonings, i.e., although the court may have listed some reasoning, the court failed to specifically place Scott in one of the four maximum sentence categories. As such, this assignment of error has merit.
We also note that the court imposed the ten year sentence for attempted aggravated murder consecutive to the life sentence for aggravated murder. Although appellant does not present this argument, R.C.2929.19(B)(2)(c) requires the trial court to make a finding that gives its reasons for imposing consecutive sentences. See, also, R.C.2929.14(E)(3) (listing the criteria for imposing consecutive sentences). In this case, the court did not mention its reasons for imposing consecutive sentences.
Typically, we would reverse and remand for resentencing. However, as we are reversing Scott's conviction under his third assignment of error and allowing a new trial to proceed, there is not yet an attempted aggravated murder conviction upon which sentencing may proceed. The trial court is thus instructed to be mindful of the aforementioned felony sentencing guidelines and the case law interpreting those guidelines if appellant's sentencing is once again before the court.
 ASSIGNMENT OF ERROR NUMBER THREE
Appellant's third assignment of error provides:
 "THE TRIAL COURT ERRED IN SUSTAINING THE STATE'S MOTION IN LIMINE, PREVENTING THE JURY FROM HEARING TESTIMONY OF SEVERAL KEY DEFENSE WITNESSES."
Donnell Cuthbertson, Paul Brown, and Adrien Brown were listed as defense witnesses in discovery material. Before trial, subpoenas were served at the Mahoning County Justice Center to secure the attendance of these inmates at trial. They were apparently being called to testify that they heard Kendrick Mickel incriminate himself as the shooter when he was in jail and to thus impeach Kendrick Mickel's testimony blaming appellant. However, Kendrick Mickel invoked his privilege against self-incrimination and refused to testify. Thereafter, the state filed a "motion in limine" seeking to exclude the allegedly inadmissible hearsay testimony of Paul and Adrien Brown. We note that the motion was not a traditional motion in limine since it was made and ruled on during trial; the court's decision was not a preliminary, pretrial ruling which must later be preserved by objecting at trial. See State v. Grubb
(1986), 28 Ohio St.3d 199, 203.
A sworn statement of Paul Brown dated November 13, 1997 was proffered by the defense.[2] In this statement, Paul Brown related that while in jail in July 1997, he talked to appellant and Kendrick Mickel about the incident, at which time Kendrick Mickel bragged about shooting Lori Townsend with his SK assault rifle in an attempt to kill Albert Byrd.
The defense then proffered the live testimony of Donnell Cuthbertson who stated that while in jail in May or June 1997, he overheard Kendrick Mickel tell appellant that he did not mean to shoot Lori Townsend and ask appellant if he "was going to tell on him." (Tr. 394). For some reason, the defense decided against presenting a live proffer of testimony from Adrien Brown although he had been transported from the jail and from prison before that. (Tr. 388).
As aforementioned, the statement of Paul Brown and the testimony of Donnell Cuthbertson were proffered in response to the state's argument that the testimony of these witnesses was inadmissible hearsay. The defense argued otherwise under Evid.R. 804(B). This rule provides in pertinent part:
 "Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
* * *
 (3) Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another person, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability, whether offered to exculpate or inculpate the accused, is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."
Thus, there is a three part test for the admissibility of out of court statements which are against the declarant's penal interest: (1) the declarant must be unavailable; (2) the statement must so far tend to subject the declarant to criminal liability that a reasonable person in his position would not have made the statement unless he believed it to be true; and (3) the statement must be corroborated by circumstances clearly indicating its trustworthiness.
Under the first prong of the test, a declarant is unavailable where he is exempted from testifying by a court ruling based upon a privilege, such as the privilege against self-incrimination. Evid.R. 804(A)(1) and 1980 Staff Note thereto. See, also, State v. Landrum (1990),53 Ohio St.3d 107, 113. A declarant is not considered unavailable where his exemption is due to procurement or wrongdoing of the proponent for the purpose of preventing the declarant from testifying. Evid.R. 804(A)(5).
At trial, the state argued that Kendrick Mickel was not "unavailable" because his refusal to testify was procured by appellant. However, the state does not make any argument regarding this unavailability issue on appeal. Even if we review the unavailability issue, the argument presented by the state at trial is without merit. Kendrick Mickel was questioned under oath in chambers after invoking his Fifth Amendment right against self-incrimination. When informed that he would be held in jail over the weekend on a material witness warrant, Kendrick Mickel did answer affirmatively to the state's question on whether he was afraid that he might get hurt in jail. (Tr. 170). However, there was no reference to Christopher Scott. Kendrick Mickel stated that he cannot testify due to "personal reasons" and again pled the Fifth Amendment. (Tr. 183, 188). In support of its allegation that Scott procured Kendrick Mickel's unavailability, the state relied on these statements and the prosecutor's claim that Kendrick Mickel's mother revealed that Kendrick Mickel would not testify due to fear for his family's safety. (Tr. 187).
First, none of the statements made by Kendrick Mickel indicate that Scott procured his unavailability due to wrongdoing such as making threats. Second, the prosecutor's statement about what Kendrick Mickel told his mother is double or even triple hearsay. Regardless, the fact that a witness decides not to testify out of fear for his family's safety does not per se translate into procurement or wrongdoing by the accused; the state failed to ask Kendrick Mickel whether he had been expressly or impliedly threatened by Christopher Scott or an acquaintance of Scott. In conclusion, Kendrick Mickel expressly invoked his privilege against self-incrimination, and the court accepted this invocation; Kendrick Mickel did not testify and the court did not find that appellant somehow encouraged his decision to invoke this privilege. Accordingly, the unavailability prong of the test for admission of statements against interest was satisfied.
The second prong of the test is also satisfied. Once again, the state does not address this prong on appeal. Moreover, the state did not argue this prong at trial. This is most likely because it appears indisputable that Kendrick Mickel's statements that he shot Lori Townsend clearly would subject him to criminal liability, and that no reasonable person would have made them unless he believed them to be true. See Landrum,53 Ohio St.3d at 113.
The third prong of the test is where the real controversy lies. To be admissible, Evid. R. 804(B)(3) requires that Kendrick Mickel's statements be corroborated by circumstances which clearly indicate the trustworthiness of the statements. The question of whether corroborating circumstances are sufficient rests within the discretion of the trial court. Sumlin, 69 Ohio St.3d at 108-109, citing Landrum,53 Ohio St.3d at 114. The proponent of a statement against interest is said to face a "formidable burden" in jumping the significant corroborating circumstances hurdle. Landrum, 53 Ohio St.3d at 114.
For instance, in Sumlin, a defendant accused of a shooting sought to introduce notes written by a codefendant confessing his part in the shooting. The Supreme Court found that the trial court did not abuse its discretion in excluding the notes. The Court noted that some circumstances corroborated the trustworthiness of the notes, e.g., the defendant's sister testified that he was not present when the shots were fired. Id. at 109. However, the Court pointed out that the declarant wrote the notes under suspicious circumstances that were not spontaneous, e.g., only in the presence of the defendant's friends after the defendant's trial had already begun. Id. The Court also stated that a factor decreasing the trustworthiness of the notes of confession was that the declarant had already been identified as the shooter of one victim so the exculpation of the defendant as to that victim did not make it more likely that the declarant would be punished. Id. at 109-11 (noting that the traditional application of the statement against interest exception is where the declarant's statement substitutes the declarant for the accused as the single culprit and that although scenarios of complicity may decrease the trustworthiness of the statement, such a scenario is not determinative).
In State v. Gilliam (1994), 70 Ohio St.3d 17, the Supreme Court stated that the trial court did not abuse its discretion in finding sufficient corroborating circumstances for the admission of a statement against interest where the content of the statement was corroborated by other witnesses' testimonies. Id. at 20-21 (where the declarant made the statement to police after being read his rights).
Finally, in Landrum, a defendant accused of murder sought to introduce a statement by a declarant who admitted that he, rather than the defendant, slit the victim's throat. The Supreme Court found sufficient corroborating circumstances existed in the defendant's own testimony and the lack of blood on the defendant's clothing. Id. at 114 (also noting that the statement was made spontaneously the day after the murder and that the declarant had no motive to lie). The Court pointed out that the credibility of the witness who is proffered to testify as to the declarant's statement does not affect the statement's admissibility and noted that the trustworthiness of the statement, not the witness, is at issue. Id. For these reasons, the Supreme Court found that the trial court abused its discretion in excluding the statement. (Note that inLandrum, the exclusion of evidence occurred at the sentencing phase in a capital trial and, thus, instead of reversing, the Court conducted its independent weighing of the evidence as if the declarant's statement had been admitted.)
In the case at bar, Donnell Cuthbertson's proffered testimony established that he overheard Kendrick Mickel tell appellant that he did not mean to shoot Lori Townsend and ask appellant if he was "going to tell on him." Appellant took the stand in his own defense and testified that Kendrick Mickel pulled out his SK assault weapon after noticing Albert Byrd walking down the street and stating that Albert Byrd was the one "who shot up a house the other week." (Tr. 342) Appellant testified that Kendrick Mickel said, "I'm going to kill him. * * * he tried to kill me, kill you so I'm going to kill him." (Tr. 343). Appellant testified that he tried to dissuade Kendrick Mickel and grabbed for the gun. He said that Kendrick Mickel pushed him away and fired a shot at the car. (Tr. 344).
Appellant's testimony corroborates Kendrick Mickel's statement to Donnell Cuthbertson that Kendrick Mickel fired the shot and that he did not mean to shoot Lori Townsend. Paul Brown's statement provides further corroboration as it demonstrates that Kendrick Mickel made similar statements on prior occasions. See State v. Akers (Apr. 4, 1997), Portage App. No. 95P3, unreported, 9 (where the Eleventh District noted that circumstantial indicia of corroboration may include proof that the declarant repeated his story often and consistently).
It is hard to ascertain any motive that Kendrick Mickel would have for lying to Paul Brown about being the shooter or lying to appellant when Donnell Cuthbertson overheard him state that he did not mean to shoot Lori Townsend. The fact that the statement was made in the presence of Christopher Scott in this case presents a different scenario than inSumlin where the Court implied that the declarant was compelled to write notes of confession when confronted by the accused and his friends. Besides that fact, the declarant in Sumlin had already been charged with the shooting.
The fact that Kendrick Mickel later provided a sworn statement to the state blaming appellant does not make the statements heard by Donnell Cuthbertson and Paul Brown prohibitively uncorroborated. See Landrum,53 Ohio St.3d at 115 (where the Supreme Court held that the fact that the declarant made conflicting statements, telling the witness that he did it but telling the police that the defendant did it, does not preclude admissibility). For obvious reasons, a blame-accepting statement is generally more trustworthy than a blame-shifting statement. SeeWilliamson v. United States (1994), 512 U.S. 594, 599 (noting that a reasonable person, even a lying one, tends not to make wholly self-incriminating statements unless they believe them to be true).
There is also the potential testimony of Adrien Brown to consider. Although Adrien Brown's testimony was not presented, the state's motionin limine contends that Adrien Brown should be prohibited from testifying that he heard Kendrick Mickel take the blame for the shooting. See Evid.R. 403(A)(2) stating that where a ruling excludes evidence, the evidence must be made known to the court in an offer of proof unless it was apparent from the context of questions. Since the state's motion informs the court of the gist of Adrien Brown's potential testimony, evidence excluded by the court could be considered to be apparent from the record. Prior to the proffer of testimony, the defense informed the court that there existed several witnesses that would testify substantially the same. (Tr. 316). It appears that the court made its decision excluding the testimony prior to the proffer, which was then made for purposes of appellate review. (Tr. 327-328) (where the trial court noted that arguments would be held prior to court opening the next day). Furthermore, it was the court who first instructed defense counsel that Adrien Brown's testimony was unnecessary since the statement of Paul Brown and the testimony of Donnell Cuthbertson was already proffered. (Tr. 395).
Regardless, there exists the proffered testimony of Paul Brown and Donnell Cuthbertson and the actual testimony of appellant. Another piece of corroborating evidence is the fact that the eyewitness, Albert Byrd, identified Kendrick Mickel as being with appellant when they noticed each other on the street just prior to the shooting. It must be remembered that the credibility of Donnell Cuthbertson, Paul Brown and appellant are issues for the jury to determine. Thus, their character and stories were not to be evaluated by the court for indications of dishonesty or fabrication. As aforementioned, it is the trustworthiness of the declarant's statement, not the trustworthiness of the witnesses' repeating of that statement, that was at issue before the trial court.
This case appears to represent what the Supreme Court calls a traditional case of a statement against interest being used to exculpate the defendant. Sumlin, 69 Ohio St.3d at 109-110 (stating that a traditional case is where the declarant places himself in the position in which the state places the defendant). The state claims that this is not a traditional case because even if Kendrick Mickel's statement were admitted, there is still the issue of appellant's complicity. Nevertheless, just because a proffered statement against interest is not a traditional example does not mean it is inadmissible. Sumlin,69 Ohio St.3d at 109-110. Moreover, the jury did not determine complicity, and Kendrick Mickel was no longer alleged to be a complicitor. Rather, appellant was tried as the sole offender. Hence, if Kendrick Mickel says that he was the shooter, then he places himself in the position in which the state placed appellant.
The state also notes that Kendrick Mickel's alleged statements heard by Paul Brown and Donnell Cuthbertson occurred five months after the crime. The state cites cases which note that the more spontaneous and closer in time to the crime, the more trustworthy. However, under the circumstances in this case, nothing about the timing decreases the trustworthiness of the statement.
In conclusion, in reviewing the circumstances in the case at bar, we find that the trial court abused its discretion when it excluded the proffered testimony. The statement against interest hearsay exception will have no meaning if the burden on the defendant is overly strict. See Comments to Fed. Evid.R. 804. Additionally, we cannot say the exclusion was harmless. Rather, the exclusion affected appellant's substantial rights. See Evid.R. 103(A)(2); Crim.R. 52(A). Appellant's whole defense revolves around Kendrick Mickel being the shooter. A jury may well have been more inclined to believe Scott's self-serving testimony if it heard three inmates testify that they heard Kendrick Mickel incriminate himself.[3] Therefore, this assignment of error is sustained, and this case is reversed and remanded for a new trial.
 ASSIGNMENT OF ERROR NUMBER FOUR
Appellant's fourth assignment of error contends:
 "THE TRIAL COURT ERRED TO APPELLANT'S PREJUDICE WHEN IT DENIED DEFENDANT'S MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE."
According to appellant's testimony, he was at his girlfriend's house prior to the time that he and Kendrick Mickel took the walk that resulted in the fatal shooting. (Tr. 337). After the shooting, police spoke with the girlfriend, Lakeisha Carter who was a juvenile, and she advised that appellant had been at her house around the time of the shooting. (Tr. 300). Although they believed that the murder weapon was in her house, they failed to secure a search warrant as they believed that she would dispose of the weapon before they could return. (Tr. 303).
Lakeisha Carter was listed as a defense witness in discovery material. On November 19, 1997, she was subpoenaed to testify. Apparently, she was present at the courthouse during much of the trial. On November 24, 1997, the court asked if she were present to testify, and defense counsel responded affirmatively. (Tr. 317). The state then injected arguments about portions of her testimony in line with the state's arguments under assignment of error number three. (Tr. 323-324). The court then recessed to ponder the statement against interest hearsay exception. On November 25, 1997, court reopened at 2:05 p.m. at which time appellant testified. An off the record discussion was then held. At 3:25 p.m., the court recessed after informing the jury that a defense witness was not present and that if that witness was not present at 9:00 a.m. the subsequent day, the parties would begin closing arguments. (Tr. 383-385). On November 26, 1997, the case resumed; however, Lakeisha Carter was not present.
Defense counsel then proffered Lakeisha Carter's testimony. She was to testify that Kendrick Mickel returned to her house with appellant after the shooting and that Kendrick Mickel had his SK assault weapon. Allegedly, she heard Kendrick Mickel say that he had shot someone and that his gun had jammed after the first shot. She was also going to testify that she saw Kendrick Mickel manipulate his gun to clear the jammed chamber. (Tr. 397). Thereafter, defense counsel asked that the court issue a bench warrant and continue the matter for "a couple days" until Lakeisha Carter was located. (Tr. 398, 399). The court issued the bench warrant, made comments about counsel's failure to seek a material witness warrant, and denied the continuance. (Tr. 399).
After appellant was found guilty and sentenced, he filed a timely motion for a new trial on December 11, 1997. In support of his motion, he attached a sworn statement of Lakeisha Carter dated December 3, 1997. She disclosed that before the shooting, Kendrick Mickel left her house with an assault rifle, but Christopher Scott left his gun behind. She claimed that after the shooting, Kendrick Mickel returned to her house and stated, "I know I hit somebody. * * * What the hell is wrong with this damn gun. * * * Why did the gun only fire once." She stated that she watched Kendrick Mickel take apart his gun to determine why it jammed. She noted that she was with her mother resolving personal family matters on the day that she was supposed to be testifying.
Appellant's motion for a new trial states that he used all reasonable means to locate this witness for trial and that the testimony is so significant that the outcome of the trial would have been different had the jury heard this exonerating evidence. The state countered that the statement is not newly discovered as the defense was aware of the testimony at trial and that the statement is merely corroborative of appellant's testimony which the jury chose to disbelieve. The court overruled the motion for a new trial.
Appellant now argues that the court erred in denying his motion for a new trial on the grounds of newly discovered evidence as all of the elements for granting the motion were satisfied. The state reiterates that the evidence was not newly discovered and that it was merely cumulative to appellant's testimony.
Crim.R. 33(A) provides in pertinent part:
 "A new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights:
* * *
 (6) When new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial."
The decision to grant or deny a motion for a new trial on the basis of newly discovered evidence is within the sound discretion of the trial court and, absent an abuse of discretion, that decision will not be disturbed. State v. Hawkins (1993), 66 Ohio St.3d 339, 350. To warrant the granting of a new trial in a criminal case based upon Crim.R. 33(A)(6), it must be shown that "new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence."Id., quoting State v. Petro (1947), 148 Ohio St. 505, syllabus.
Lakeisha Carter's sworn statement was made after trial, was not new evidence, and was not newly discovered. Lakeisha Carter was appellant's girlfriend. She was named as a witness and subpoenaed. She attended much of the trial. Her potential testimony was proffered into the record at trial after she failed to appear to testify. This proffer was substantially the same as the subsequently submitted sworn statement. Because the contents of her statement were known by the defense prior to and at trial, the statement cannot be described as "new evidence" that "has been discovered since trial" and that "could not in the exercise of due diligence have been discovered prior to trial." See Id. The evidence "offers no new revelations" discovered after trial. State v. Seiber
(1990), 56 Ohio St.3d 4, 17. Accordingly, the trial court did not abuse its discretion in denying the motion for a new trial, and this assignment of error is without merit.
As an aside, a footnote in appellant's brief points out that on November 26 in response to Lakeisha Carter's absence, counsel sought but the court denied a continuance of the trial. However, on appeal, appellant does not argue that the court erred in denying the request for a continuance in order to locate the witness, possibly because the court did continue the trial from 3:25 p.m. on November 25 until 9:45 a.m. the next day. The state suggests that no evidence was placed in the record to show that the defense used reasonable diligence to find Lakeisha Carter during that time. For instance, the defense did not seek a bench warrant on November 25 but instead waited until the next day. On the other hand, her testimony was very important to appellant's defense. It corroborated his story, contained statements against interest made by Kendrick Mickel and involved the witnessing of a chamber clearing act performed by Kendrick Mickel after the shooting. The defense did subpoena Lakeisha Carter and may have assumed she would show up the next day since she attended much of the trial. Regardless, this analysis brings us back to appellant's third assignment of error. It appears that even if Lakeisha Carter were present to testify, the trial court would have disallowed the parts of her testimony dealing with Kendrick Mickel's statements against interest.
 ASSIGNMENT OF ERROR NUMBER FIVE
Appellant's fifth assignment of error alleges:
 "THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT ADMITTED SCIENTIFIC EVIDENCE WITHOUT A PRELIMINARY DETERMINATION OF RELIABILITY."
Jeff Lynn, a forensic scientist at the Bureau of Criminal Investigation and Identification, testified that Christopher Scott had gunshot residue on his hands according to the results of the gunshot residue test that he performed from samples taken from appellant hours after the shooting. He testified that he used a scanning electron microscope or SEM test to detect the particles of gunshot residue.
The defense did not object to any part of Jeff Lynn's testimony. Later, when the state was entering its exhibits into evidence, the defense objected to the admission of exhibit number 13 which was identified during Jeff Lynn's testimony as a gunshot residue packet with vials containing the samples. In this objection, the defense argued that the process described by Jeff Lynn did not meet the test for scientific reliability. The court overruled the objection and admitted the exhibit.
On appeal, appellant argues that the trial court abused its discretion when it allowed Jeff Lynn to testify about the results of the gunshot residue test without performing the gatekeeping function of determining whether the test results were reliable and thus admissible. Appellant notes that the SEM type of gunshot residue test has only been used by Jeff Lynn for two years.
A trial court's decision concerning the testimony of an expert witness is within the court's broad discretion and is not to be disturbed absent an abuse of discretion. State v. Reiner (2000), 89 Ohio St.3d 342, 356. The state points out that appellant failed to object to Jeff Lynn's testimony. It thus appears that this argument should only be reviewed for plain error under Crim.R. 52(B). See State v. Moreland (1990),50 Ohio St.3d 58, 62 (where the defendant failed to object to the state's expert witness testimony). See, also, 1994 Staff Note to Evid.R. 702(C) (noting that the determination of reliability of scientific test results should be resolved by objection and decision during trial). Regardless of the review conducted, appellant's argument is without merit.
As relevant to the case at bar, Evid.R. 702(C) provides that if an expert witness is testifying about the results of a test, the testimony is reliable only if: (1) the theory behind the test is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles; (2) the design of the test reliably implements the theory; and (3) the particular test was conducted in a way that will yield an accurate result. Appellant cites Daubert v. Merrell Dow Pharm.,Inc. (1993), 509 U.S. 579 and complains that no testimony was presented on any of the four reliability factors outlined in that case. TheDaubert court stated that in evaluating reliability, the following factors may be considered: (1) whether the theory or technique has been tested; (2) whether it has been subjected to peer review; (3) whether there is a known or potential rate of error; and (4) whether the methodology has gained general acceptance. Id. at 593-594.
There was no testimony explicitly responding to the four Daubert
factors. However, "[a]lthough these factors may aid in determining reliability, the inquiry is flexible." Miller v. Bike Athletic Co. (1998), 80 Ohio St.3d 607, 611, citing Daubert, 509 U.S. at 594. None of the four factors are prerequisites for admissibility. In fact, it has specifically been held that a test need not have gained general acceptance in the field to be reliable and admissible. Id., invalidating the holding of Frye v. United States (D.C.App. 1923), 293 F. 1013.
Moreover, had an objection been entered by the defense, it is most probable that the state would have asked Jeff Lynn whether the theory behind the gunshot residue test used by him has been tested and subjected to peer review, whether the methodology has gained general acceptance, and whether the test has a potential rate of error. In fact, Jeff Lynn testified that the SEM test he used has been in existence since the early 1970's and that his laboratory has been using it since late 1995, two years prior to his testimony. (Tr. 240). He also stated that he has attended courses on performing the SEM test. (Tr. 239).
Basically, this court should review the three requirements of reliability outlined in Evid.R. 702(C). As for Evid.R. 702(C)(1), the use of a scanning electron microscope to detect elements that can only be found in gunpowder is objectively verifiable. See State v. Davis (1991),62 Ohio St.3d 326, 341 (stating that the gunshot residue test, unlike the polygraph test, involves objective measurements). Regarding Evid.R. 702(C)(2), prior to reporting the results of the test, Jeff Lynn testified how the design of the test implements the theory behind it. He reviewed the collection procedures and the workings of the electron microscope. He explained what elements are only found in gunpowder and how these elements are sought and analyzed. (Tr. 241-247). Lastly, Evid.R. 702(C)(3) was also satisfied. Testimony established that plastic gloves were worn during collection so as not to contaminate the sample. The labeling of the vials was explained. The preparation of the samples for testing was outlined. Jeff Lynn testified that when he ran the test in this case, he discovered seven particles of gunpowder on the right hand and three particles on the left hand. Nothing indicates that this particular test was conducted in a way that will yield inaccurate results. Under the preceding analysis, this assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER SIX
Appellant's sixth assignment of error contends:
 "APPELLANT'S CONVICTION SHOULD BE REVERSED BECAUSE THE EVIDENCE SUPPORTING THE CONVICTION WAS INSUFFICIENT AS A MATTER OF LAW TO PROVE THE CONVICTION BEYOND A REASONABLE DOUBT."
Although we are reversing and remanding for a new trial on appellant's third assignment of error, we must review this assignment because it alleges an insufficiency of evidence. Where evidence is insufficient, the case may not be retried by the state. State v. Thompkins (1997),78 Ohio St.3d 380, 387. Whether or not the state's evidence is sufficient is a matter of law dealing with adequacy. Id. at 386. The court must view the evidence in the light most favorable to the prosecution and determine whether any rational fact-finder could find that the essential elements of the crime have been proven beyond a reasonable doubt. State v. Goff
(1998), 82 Ohio St.3d 123, 138, quoting State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus.
The only element disputed by appellant under this assignment is his identity as the perpetrator. Specifically, he states that he was convicted solely on the testimony of Albert Byrd and implies that Albert Byrd had a motive to lie. He contends that the state failed to prove that he fired the gun and refers to his prior argument that the gunshot residue test was not scientifically reliable.
First, we should note that after reviewing the transcripts, it is apparent that a rational fact-finder could find that the state proved the elements of aggravated murder and attempted aggravated murder, specifically that Christopher Scott was the shooter, beyond a reasonable doubt. Albert Byrd testified that Scott approached the car window and fired into the car. Taken in the light most favorable to the state, sufficient evidence established that Scott was the shooter.
Further, appellant's argument that the victim's testimony was uncorroborated actually deals with weight of the evidence rather than sufficiency. State v. Hannah (1978), 54 Ohio St.2d 84, 90-91 (holding that a verdict is not against the manifest weight of the evidence merely because the victim's testimony is uncorroborated). See, also, State v.Gore (1999), 131 Ohio App.3d 197, 200-201 (where we held that if the trial revolves around two different stories about the same event, either one of which, if believed, is sufficient evidence to prove or disprove the prosecution's case, the issue is weight rather than sufficiency). We need not delve into the issue of the weight of the evidence because we are remanding for a new trial on assignment of error number three. However, we will point out that as we sit as the thirteenth juror, we will reverse a jury's verdict on the grounds of manifest weight of the evidence only if the jury clearly lost its way and created a manifest miscarriage of justice. Thompkins, 78 Ohio St.3d at 387. The jury is in the best position to observe the demeanor, gestures and voice inflections of the witnesses who testify before it. See Seasons Coal Co. v.Cleveland (1984), 10 Ohio St.3d 77, 80. It is the jury's province as fact-finder to judge the credibility of varying stories; they are entitled to believe one and disbelieve another. See State v. DeHass
(1967), 10 Ohio St.2d 230, 231. As aforementioned, the testimony of an eyewitness/victim need not be corroborated to be credible. Moreover, there was corroboration in this case, e.g., identification remained consistent, gunshot residue was found on Scott's hands, Scott testified that he was present during the shooting and confirmed that he previously had a heated argument with Lori Townsend and Albert Byrd.
In conclusion, we do not agree that the verdict was based upon insufficient evidence or that jury lost its way in evaluating the weight of the evidence and the credibility of witnesses. Accordingly, this assignment of error is without merit.
 ASSIGNMENT OF ERROR NUMBER SEVEN
Appellant's seventh and final assignment of error provides:
 "THE TRIAL COURT ERRED TO APPELLANT'S PREJUDICE WHEN IT ADMITTED PHOTOGRAPHS WHEN THEIR PROBATIVE VALUE WAS OUTWEIGHED BY A DANGER OF UNFAIR PREJUDICE."
During the testimony of the forensic pathologist, Dr. Giles, two exhibits were identified by the state. Exhibit number 16 was a photograph of two x-rays of Lori Townsend's head and upper chest demonstrating metal fragments and skull injuries. One x-ray was a front to back view, and the other x-ray was a side to side view. Exhibit number 17 was an autopsy photograph of the side of Lori Townsend's head depicting her head wound after it had been cleaned and her head had been partially shaved. During Dr. Giles' testimony, defense counsel objected to the exhibits, stating that they were inflammatory, prejudicial and not probative. (Tr. 211). This objection was overruled. Notably, when the state was offering its exhibits into evidence, defense counsel only objected to exhibit number 17. (Tr. 309). On appeal, appellant contends that both exhibits were gruesome and inadmissible because their probative value was substantially outweighed by the danger of unfair prejudice.
Pursuant to Evid.R. 403(A), relevant evidence must be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. The application of this rule during the evaluation of photographs is left to the sound discretion of the trial court. State v. Lundgren (1995),73 Ohio St.3d 474, 485. Even if the court abuses its discretion in admitting prejudicial photographs, the case is not reversed unless substantial rights of the defendant are affected by the admission. Id. at 486, citing Evid.R. 103 and Crim.R. 52(A).
The mere fact that a photograph is gruesome does not render it inadmissible. State v. Maurer (1984), 15 Ohio St.3d 239, 264. Gruesome photographs are admissible if they assist the fact-finder in determining the issues or are illustrative of witness testimony and forensic evidence without causing material prejudice. Id. at 266. See, also, State v.Mason (1998), 82 Ohio St.3d 144, 158 (noting the admissibility of photographs of the victim's body to illustrate the testimony of the coroner); Landrum, 53 Ohio St.3d at 121 (stating that the admission of a photograph depicting a close-up view of the victim's slit throat is admissible to show cause of death).
In State v. Williams (Mar. 20, 2000), Mahoning App. No. 98CA74, unreported, we first stated that x-rays revealing bullets and fragments lodged in a victim's head and thigh were probative and were not gruesome, shocking or prejudicial. We also held that a photograph of a gaping bullet wound to the chest revealing red tissue and measuring six inches long by two inches wide was gruesome but admissible. We noted that the wound was cleaned and no traces of blood were on the skin outside of the wound. We pointed out that the photograph illustrated the location of the wound and corroborated the coroner's testimony and witness testimony about the angle of the shot. Id. at 11-12. See, also, State v. Twyford
(Sept. 25, 1998), Jefferson App. No. 93J13, unreported, 32.
In the case at bar, one photograph of two head x-rays is probative and illustrative of the coroner's testimony regarding the victim's skull injuries and how the bullet broke up before it hit the victim as a result of passing through the glass car window causing the victim to be pelted with various pieces of the bullet. Morever, the photograph of the x-rays is not gruesome or prejudicial.
To the contrary, the picture of the victim's head wound, although cleaned by Dr. Giles, is gruesome. However, it is illustrative of the cause of death. See Landrum, 53 Ohio St.3d at 121. See, also, State v.Treesh (2001), 90 Ohio St.3d 460, 484. Moreover, the photograph was illustrative of other testimony of the coroner, the testimony of Albert Byrd and the testimony of other witnesses. For instance, it corroborated that the victim was shot at an angle on the right side of her head, the same side on which Albert Byrd, the intended victim, was sitting. Albert Byrd testified as to the location of the shooter. Other testimony established that Albert Byrd's left shoulder was covered in brain matter and blood. The coroner testified that the victim's head was turned toward the shooter and that the path of the projectile was backward and slightly to the right. (Tr. 216). In conclusion, the photograph of the victim's head wound was gruesome but its probative value was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Thus, this assignment of error is overruled.
For the foregoing reasons, the judgment of the trial court is hereby reversed and this cause is remanded for further proceedings according to law and consistent with this court's opinion.
DONOFRIO, J. and DeGENARO, J., concurs.
[1] See Poe v. State (1996), 341 Md. 523, 528 (holding that where one shot passes through the intended victim leaving her injured and kills a bystander, transferred intent may be used to convict the defendant of the murder of the bystander even though he was also convicted of the attempted murder of the intended victim); 1 LaFave Scott, Substantive Criminal Law (1982) 401, Section 3.12(d) (stating that in bad aim cases, after transferring the offender's intent to convict him of murder of the bystander, the offender may be convicted of attempted murder of the intended victim). See, also, State v. Sowell (1988), 39 Ohio St.3d 322,331 (noting that the successful killing of the intended victim does not prevent the transfer of intent to an unintended victim; Ochoa v. State
(1999), 981 P.2d 1201, 1205 (similarly holding).
[2] The state suggests we disregard the statement since it was not included in the record. However, the statement was given to the state in discovery, discussed in chambers, viewed by the court in making its ruling, and identified by the court reporter as an exhibit. (Tr. 316, 390, 395). Most importantly, although exhibits usually must be admitted after identification, this was a proffer which the state agreed to admit and stipulated "would be the gist of his testimony." (Tr. 395, 401, 402). It was not an exhibit to be viewed by the jury.
[3] We note that according to appellant's fourth assignment of error, it appears that another witness may have heard Kendrick Mickel make incriminating statements minutes after the shooting.