BROWN et al., Appellees and Cross–Appellants,

v.

SPITZER CHEVROLET COMPANY, Appellant and Cross–Appellee.

[Cite as *Brown v. Spitzer Chevrolet Co.*, 181 Ohio App.3d 642, 2009-Ohio-1196.]

Court of Appeals of Ohio,
Fifth District, Stark County.

No. 2008CA00033.

Decided March 16, 2009.

644

Fortney & Klingshirn and Joseph R. Spoonster, for appellees and cross-appellants.

Giardini, Cook & Nicol, L.L.C., and Anthony B. Giardini, for appellant and cross-appellee.

HOFFMAN, Presiding Judge.

{¶ 1} Defendant-appellant and cross-appellee, Spitzer Chevrolet Co. ("Spitzer"), appeals the January 14, 2008 judgment entry entered by the Stark County Court of Common Pleas, which overruled appellant's objections to the magistrate's June 15, 2007 decision and approved and adopted that decision granting judgment in favor of plaintiffs-appellees and cross-appellants, Earl W. Brown et al. ("the Browns"), and awarding damages to the Browns in the amount of $503,852.211 as an order of the court.

## STATEMENT OF THE CASE AND FACTS

{¶2} On October 10, 2006, the Browns filed a complaint in the Stark County Court of Common Pleas, naming Spitzer as defendant and asserting claims for breach of lease agreement, negligence, and unjust enrichment. Spitzer filed a timely answer. The matter proceeded to trial before the magistrate on April 23, 2007.

{¶3} The following evidence was presented at trial. The Browns owned commercial property located at 407 North Main Street, North Canton, Stark County, Ohio ("the property"). The property was purchased in 1922 by Earl Brown's father, Julius Brown, who built and operated an automobile dealership thereon. From 1922 through March 2005, the property was continuously used as an automobile dealership. The property consists of approximately 1.28 acres of land upon which the original 1922 showroom building, an attached service building constructed in 1963 by W & J Chevrolet, and an asphalt parking lot are situated.

{¶4} Spitzer purchased the Chevrolet franchise from W & J Chevrolet and subsequently leased the property from the Browns. Prior to executing the lease with Spitzer, the Browns had the property appraised by D.F. Smith Agency. The appraisal stated that the fair-market value of the property was $319,000, as of June 24, 1983. The appraisal rated the overall condition of the property as "good" and did not note any defects. The parties executed the first lease on December 12, 1983. The first lease was for a period of five years, with an option for Spitzer to renew the lease for two additional five-year periods, for a potential lease term of 15 years.

{¶5} Under the provisions of the first lease, Spitzer paid $3,000 per month for the first 30 months and $3,300 per month for the second 30 months and paid all utilities, taxes, and insurance on the property. The lease also obligated Spitzer to "make all repairs necessary to the demised property and the building and appurtenances situated thereon in as good order and condition as when delivered to it." Within ten days of the date of possession, Spitzer was to inspect the premises and notify the Browns of any defects in the property. Spitzer never notified the Browns of any defects in the property during the contractual ten-day period, despite arguing at trial that the property was in poor condition. Spitzer made several repairs and improvements to the property after taking possession. The repairs and improvements included erecting pole lights around the parking lot, painting the interior and exterior of the building, constructing a new showroom barrel roof, adding exterior wood trim, and installing a new rooftop heating and air conditioning unit. Spitzer also added a rear asphalt parking lot in 1987, replaced the sewer line in 1991, installed a new boiler in 1997, and installed a new air-conditioning unit in 1999.

{¶ 6} The parties entered into a second lease on April 28, 1994. Like the first lease, the second lease was for a period of five years. At trial, Spitzer stipulated that it authored the second lease, as well as all subsequent leases. The second and all subsequent leases required Spitzer to pay all taxes and utilities on the property. Under the second lease, the rent increased to $4,316.80 per month. Spitzer did not notify the Browns of any defects in the condition of the property prior or subsequent to signing the second lease.

{¶ 7} From the inception of the first lease, Spitzer intended to relocate the dealership. Spitzer and General Motors Corporation executed a relocation agreement and business plan on June 5, 1998. Spitzer had previously purchased property for the relocation of its dealership. In April 2000, Spitzer notified the Browns of its intent to move the dealership to its new location in December 2000 and proposed an increase in rent of $430 per month. The move was ultimately delayed due to protests filed by other area Chevrolet dealers. On December 5, 2000, Spitzer advised the Browns that it anticipated moving the dealership within three years and proposed a month-to-month lease agreement with yearly rent increases of $4,800, $5,000, and $5,200 per month. Spitzer also proposed that the parties enter into an option under which Spitzer could purchase the property for $600,000 or the Browns could purchase, for $400,000, real property owned by a Spitzer-affiliated company and adjacent to the property.

{¶ 8} The Browns obtained an appraisal of the property from Dannemiller Appraisal Services. The appraisal determined, as of December 18, 2000, the fair-market value of the property to be $600,000. The Browns sent a letter to Spitzer on March 29, 2001, indicating their willingness to enter into a third lease with the rent terms as previously proposed by Spitzer. Although the Browns offered to sell the property, they advised Spitzer that they were not interested in purchasing the adjacent property. Thereafter, on September 1, 2001, the parties entered into a third lease, with a two-year term. Under the terms of the third lease, the rent increased to $4,800 per month for the first year and $5,000 per month for the second year. Spitzer had the option to continue its occupancy on a month-to-month basis until August 31, 2004. The rent under this option increased to $6,000 per month. The third lease required Spitzer to pay all utilities, taxes, and insurance on the property. Spitzer was required to increase the insurance from $550,000 to $650,000. The third lease included an option for Spitzer to purchase the property for $650,000. Spitzer did not notify the Browns of any defects in the condition of the property when entering into the third lease.

{¶ 9} On March 13, 2003, a Spitzer employee contacted the Browns and notified them of a problem with one of the service-area garage doors. The Browns visited the property in order to inspect the door and found the basement structural steel to be seriously deteriorated. The Browns showed Kevin Spitzer

the deterioration. Spitzer informed the Browns that he would have his builder look at the basement and he would take care of the situation. No evidence or testimony was presented at trial to establish that Spitzer ever addressed the condition of the basement structural steel. Spitzer was unable to move the dealership by the projected date of August 31, 2004; therefore, on September 28, 2004, the parties entered into a fourth lease, for a six-month period. The fourth lease was identical to the second and third leases, except for the surrender provision. Under the fourth lease, the surrender provision was modified to require Spitzer to "surrender the premises in as good condition as they were at the beginning of the occupancy." The second and third leases used the word "term" rather than "occupancy."

{¶ 10} Following a safety inspection of the property by the North Canton Fire Prevention Bureau in October 2004, the North Canton Building Department ordered the Browns to address the structural defects found by the fire department and to retain a structural engineer to evaluate the situation. The North Canton Fire Department had conducted a safety inspection in May 1984 and did not report any structural defects in the property. Following the October 2004 inspection the Browns hired Koehlinger Engineering to prepare a plan to temporarily shore up the basement and also purchased steel reinforcement beams and posts to make the necessary temporary repairs. The Browns incurred costs and expenses in the amount of $1,922.50 for the repairs.

{¶ 11} The Browns subsequently conducted a complete inspection of the property, which revealed that Spitzer had failed to repair and/or maintain the property. Via letter dated February 17, 2005, the Browns itemized all of the necessary repairs and maintenance required for the property. In response, Spitzer advised the Browns that it would perform all repair and maintenance required under the lease. Spitzer did not complete any of the repairs or perform any maintenance work.

{¶ 12} With respect to the necessary repairs and maintenance, the evidence revealed that the barrel roof over the showroom was leaking in at least two areas and that the flat roof over the service area, which had been installed in 1963, was leaking in at least one area. Experts for both the Browns and Spitzer testified that the roofs were beyond their useful life expectancies and needed to be completely replaced. The rooftop heating and air-conditioning unit was not fully operational and needed to be replaced. The boiler was compromised due to excessive rust, which was the result of water leakage from overhead pipes, and needed to be replaced. The hot-water tank located in the basement had rusted to the point that water was leaking and it needed to be replaced. The front and rear asphalt parking lots were in states of disrepair, requiring major work. Several dozen windows were either broken or missing. Spitzer had removed

fixtures, causing holes in the drywall and masonry brick. The exterior paint was peeling and blistering, and exterior wood trim was rotting or missing in many areas. Further, the electrical system was in need of maintenance due to damage. The exterior bricks and masonry were cracked due to the expansion and decay of the lintels, as well as water penetration from the flat roof.

{¶ 13} A letter from the building department dated October 29, 2004, which was admitted into evidence, as well as the testimony of Bob Mural of Mural and Sons, established that the structural steel in the basement was deteriorated to the point of requiring major repairs. Kevin Spitzer and Ron Smith, a maintenance employee for Spitzer, testified that the structural steel in the basement was in a state of decay when Spitzer initially moved into the property in 1984. Smith explained that shortly after Spitzer moved into the property, he shored up the basement ceiling with five red Tel–O–Posts because of the decay of the structural steel. Scott Brown, the Browns' son, testified that he observed four Tel–O–Posts bearing the label "9–94," in March 2003. Paul Braham of Cardinal Home Products testified that his company manufactures the Tel–O–Posts, and the label observed by Scott Brown was a date stamp indicating that the posts were manufactured in September 1994. Professional witnesses for both parties testified that the decay of the structural steel could occur any time from as little as five years, in a corrosive atmosphere, to ten or 15 years or as long as 20 years. Spitzer occupied the property for 21 years.

{¶ 14} The Browns presented evidence of repair estimates and proposals. The total estimated and proposed cost to repair the property was $339,929.71. Spitzer stipulated to the reasonableness of the costs. Tim Calvey, a licensed professional engineer, certified professional estimator, and certified planning and scheduling professional, testified that he conducted multiple inspections of the property, reviewed the repair estimates and proposals obtained by the Browns, and analyzed industry databases. Calvey opined that the total direct costs to repair the property would be $308,050.22. Bryan Kagel of the Staubach Co., a licensed real estate agent, testified that he has represented both landlords and tenants in commercial transaction for over 16 years. Kagel stated that the fair-market value of the property in its present condition is $373,480, but noted that had the property been reasonably maintained, the fair-market value would be $861,161. Kagel arrived at this figure by utilizing the income approach, a comparable-sales analysis, and a cost approach.

{¶ 15} Following the hearing, each party submitted proposed findings of fact and conclusions of law. The magistrate issued her decision on June 15, 2007. The Browns and Spitzer each filed objections. Via judgment entry filed January 14, 2008, the trial court overruled the objections and adopted the magistrate's decision as its final judgment.

{¶ 16} It is from this judgment entry, as well as the magistrate's June 15, 2007 decision, that Spitzer appeals, raising the following as error:

{¶ 17} "I. The trial court erred as a matter of law by determining that the lease agremeent(s) [sic] between the plaintiffs and defendant were 'absolute triple net' leases and as such imposed greater duties on the defendant regarding the care maintenance and repair of the premises than the actual language of the lease required.

{¶ 18} "II. The trial court erred as a matter of law by awarding damages based on costs of repair instead of difference in value of the property if it had been maintained in the condition it was in at the time the lease began and the value as it was on the date the lease ended.

{¶ 19} "III. The trial court erred as a matter of law by allowing Bryan Kagel to testify as an expert witness on the value of the real estate where he had no training or education regarding the appraisal of real estate.

{¶ 20} "IV. The trial court erred as a matter of law by allowing Bryan Kagel to offer an opinion as to value of the real estate where he had no basis of knowing the condition of the real estate at time defendant first occupied it.

{¶ 21} "V. The trial court erred as a matter of law by awarding plaintiffs damages for lost rents for a 27 month period beyond the end of the lease term where plaintiffs' own evidence established three months as a reasonable amount of time to complete any repairs plaintiffs' claimed were necessary in order to lease the premises and no repairs were ever attempted.

{¶ 22} "VI. The trial court erred as a matter of law by granting plaintiffs' pre-judgment interest on the amount of the 'estimated cost of repairs' and on lost rents despite the fact that no repairs have been made and the dollar amount of the repairs was not known until the time of the trial and no rent was due at the end of the lease.

{¶ 23} "VII. The trial court's finding that the deterioration of the steel posts and beams in the basement portion of the building was caused by defendant-appellant's neglect was against the manifest weight of the evidence.

{¶ 24} "VIII. The trial court's finding that the steel posts and beams in the basement portion of the plaintiffs' building were in need of replacement at a cost of $79856 was against the manifest weight of the evidence and contrary to law.

{¶ 25} "IX. The trial court's finding that the lintels above the window framings of the building had to be replaced at a cost of $19,868 was against the manifest weight of the evidence and contrary to law.

{¶ 26} "X. The trial court's finding that the structural beams in the attic of the old part of the building had to be replaced at a cost of $22,463 was against the manifest weight of the evidence and contrary to law.

{¶ 27} "XI. The trial court's finding that the asphalt parking lots which defendant-appellant installed on the premises had to be replaced at a cost of $26840 as a result of defendant-appellant's failure to maintain it was against the manifest weight of the evidence and contrary to law.

{¶ 28} "XII. The trial court's finding that the sidewalks in front of the building needed to be replaced at a cost of $14,800.00 due to defendant-appellant's failure to repair was against the manifest weight of the evidence and contrary to law.

{¶ 29} "XIII. The trial court's finding that the roofs walls on the roofs and new aluminum caps to the walls of the roofs had to be replaced at a total cost of $106700 as a result of defendant-appellant's failure to maintain said roofs was against the manifest weight of the evidence and contrary to law.

{¶ 30} "XIV. The trial court's finding that the overhead garage doors to the service department of the building need to be replaced at a cost of $9,000 as a result of defendant's failure to repair or maintain said doors was against the manifest weight of the evidence and contrary to law."

{¶ 31} The Browns cross-appeal, asserting as error:

{¶ 32} "I. The court erred in allowing Spitzer to untimely file objections to the magistrate's decision untimely file the trial transcript and to supplement its objections.

{¶ 33} "II. The court erred in adopting the magistrate's decision awarding lost rent damages of $162,000 when the trial testimony established that the fair market value of the lost rent damages totaled $220,212.

{¶ 34} "III. The court erred in failing to modify the magistrate's decision to award lost rent post-judgment."

## SPITZER'S APPEAL

### I, II

{¶ 35} In the first assignment of error, Spitzer maintains that the trial court erred as a matter of law in determining that the lease agreements executed by the parties were "absolute triple net" leases, therefore imposing a greater duty than the actual leases required relative to the care, maintenance, and repair of the property. Specifically, Spitzer contends that the repair and maintenance obligations under the leases did not include replacement and restoration of existing structures, fixtures, and mechanicals. In its second assignment of error,

Spitzer contends that the trial court erred as a matter of law in awarding damages based upon the costs to repair the property rather than awarding damages based upon the difference in the value of the property had it been maintained in its 1984 condition and the value at the end of Spitzer's occupancy.

{¶ 36} When construing and interpreting lease provisions, courts have applied traditional contract principles and have enforced a lease as written if its language is clear and unambiguous. *Myers v. E. Ohio Gas Co.* (1977), 51 Ohio St.2d 121, 125, 5 O.O.3d 103, 364 N.E.2d 1369. If the language of a lease is clear and unambiguous, courts must enforce the instrument as written. *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.* (1992), 64 Ohio St.3d 657, 665, 597 N.E.2d 1096.

{¶ 37} Section 8 of the leases defined Spitzer's obligation for "Care, Maintenance and Repair of Premises" as follows:

{¶ 38} "Tenant shall commit no act of waste and shall take good care of the premises and the fixtures and appurtenances therein, and shall, in the use and occupancy of the premises, conform to all laws, orders and regulations of the federal, state, and municipal governments or any of their departments; Tenant shall be responsible for the repair and maintenance of heating, plumbing, electrical and air conditioning equipment and fixtures. Tenant shall further be responsible for the replacement of broken glass. Tenant shall also maintain the exterior of the premises including the roof and the structural integrity of the walls and foundations of the building and gutters, downspouts and gas, water and sewer lines."

{¶ 39} The surrender provisions under the second and third leases obligated Spitzer to "surrender the premises in as good condition as they were at the beginning of the term." The surrender provision under the fourth lease was modified to require Spitzer to "surrender the premises in as good condition as they were at the beginning of the occupancy."

{¶ 40} The trial court conducted an extensive analysis in determining Spitzer's obligations under the leases. The trial court found that the leases were triple-net leases, under which Spitzer assumed most of the obligations related to the property. Spitzer argues that such a determination was erroneous and, as a result, the trial court imposed upon it greater duties than the duties imposed under the actual language of the leases.

{¶ 41} We find that the correctness of the trial court's finding that the leases were triple-net leases is not determinative because the language of the leases controls. The leases unambiguously obligated Spitzer to "commit no acts of waste," "take good care of the premises and the fixtures and appurtenances therein," "be responsible for the repair and maintenance of heating, plumbing,

electrical and air conditioning equipment and fixtures," and "maintain the exterior of the premises including the roof and the structural integrity of the walls and foundations of the building and gutters, downspouts and gas, water and sewer lines." Spitzer failed to honor those obligations. As a result, the building fell into such a state of deterioration that it became unsafe. We agree with Spitzer that the leases did not expressly impose a duty to replace or restore. Nonetheless, we find that Spitzer cannot claim it did not have a duty to replace or restore any or all of the property when, through its complete disregard of its express obligation to repair and maintain, the property has become so deteriorated that the only means of repairing is through replacement. We also find that the trial court did not err in awarding damages based upon the costs to repair because of the extensiveness of the repairs needed.

{¶ 42} Spitzer's first and second assignments of error are overruled.

### III, IV

{¶ 43} In the third assignment of error, Spitzer asserts that the trial court erred as a matter of law in allowing Bryan Kagel to testify as an expert witness as to the current value of the property. In the fourth assignment of error, Spitzer argues that the trial court erred as a matter of law in allowing Kagel to offer opinion testimony as to the value of the property had it been properly maintained.

{¶ 44} The decision to admit the testimony of an expert is generally within the broad discretion of the trial court and will not be disturbed absent a showing of an abuse of discretion. *State v. Reiner* (2000), 89 Ohio St.3d 342, 731 N.E.2d 662. An abuse of discretion is more than an error of judgment, but instead demonstrates "perversity of will, passion, prejudice, partiality, or moral delinquency." *Pons v. Ohio State Med. Bd.* (1993), 66 Ohio St.3d 619, 621, 614 N.E.2d 748. When applying the abuse-of-discretion standard, an appellate court may not substitute its judgment for that of the trial court. Id.

{¶ 45} Pursuant to Evid.R. 702, "[a] witness may testify as an expert if all of the following apply: (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons; (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony; (C) The witness' testimony is based on reliable scientific, technical, or other specialized information."

{¶ 46} Spitzer contends that Kagel lacked the specialized knowledge, skill, experience, training, or education regarding valuation of real estate. Spitzer adds that Kagel's 16 years in the business of selling and leasing real estate does

not qualify him as a real estate "appraiser." Spitzer notes that the Browns did not offer any evidence establishing that Kagel possessed any skill or knowledge in the area of real estate appraisal beyond the skill or knowledge of an average lay person.

{¶ 47} Kagel testified that he is a licensed real estate broker with over 16 years of experience in commercial real estate, both new construction and existing construction. Kagel has represented buyers, sellers, lessors, and lessees throughout Ohio. He is a member of the National Association of Realtors as well as the Cleveland Area Board of Realtors. Kagel stated that he has been asked to give his opinion of the fair-market value for over 50 commercial properties. He explained that almost all of the assignments in which he is involved require a degree of valuation, adding that he has completed over 825 valuations of this type in the course of his career. Kagel's testimony demonstrated that he had specialized knowledge, skill, experience, training, and education in the appraisal of commercial property. Kagel had specialized information about real estate appraisals, and, in particular, he had sufficient information about the property by way of a visual inspection. Therefore, we find that the trial court did not abuse its discretion in allowing Kagel to give his opinion as to the value of the property.

{¶ 48} Spitzer further contends, assuming Kagel was an expert real estate appraiser, his opinion was not relevant because he did not have any knowledge of the condition of the property prior to Spitzer's occupancy. Spitzer failed to raise this argument in its objections to the magistrate's decision. Such a failure constitutes a waiver of any alleged error resulting from the magistrate's decision. *Proctor v. Proctor* (1988), 48 Ohio App.3d 55, 58, 548 N.E.2d 287. This result is in accordance with the general rule that an appellate court will not consider any error that the party complaining of the trial court's judgment could have called but did not call to the trial court's attention at a time when such an error could have been corrected or avoided by the trial court. *Schade v. Carnegie Body Co.* (1982), 70 Ohio St.2d 207, 24 O.O.3d 316, 436 N.E.2d 1001.

{¶ 49} Based upon the foregoing, Spitzer's third and fourth assignments of error are overruled.

APPEAL

V

CROSS–APPEAL

II, III

{¶ 50} Because Spitzer's fifth assignment of error and the Browns' second and third assignments of error on cross-appeal involve the issue of damages for lost

rent, we shall discuss them together. In the fifth assignment of error, Spitzer takes issue with the trial court's award of damages for lost rents. In their second assignment of error on cross-appeal, the Browns argue that the trial court erred in awarding damages for lost rent in the amount of $162,000, as the evidence established that the fair-market value of the lost rent damages totaled $220,212. In their third cross-assignment of error, the Browns contend that the trial court erred in failing to make a postjudgment modification of the award for lost rent.

{¶ 51} The trial court awarded the Browns damages for lost rent in the amount of $162,000. The trial court arrived at this figure by utilizing a monthly rent of $6,000, the rate Spitzer was paying when it vacated the property, multiplied by 27, representing the 24 months the property remained vacant plus the three months needed to make the necessary repairs. We disagree with the trial court's calculations.

{¶ 52} "[A] plaintiff in a breach of contract action is entitled to those damages which might have been expected by the parties as a natural result of a breach; those damages which might have been in the contemplation of the parties at the time of the breach, having in mind all the circumstances known to them when they dealt with one another. * * *" *R & H Trucking, Inc. v. Occidental Fire & Cas. Co. of North Carolina* (1981), 2 Ohio App.3d 269, 272, 2 OBR 298, 441 N.E.2d 816.

{¶ 53} When Spitzer vacated the property, its lease with the Browns had expired. The Browns would have, at that point, been looking for a new tenant. The Browns' need to find a new tenant was not the result of Spitzer's breach, but was created by the expiration of the lease, an event that was going to occur in the process of the business transaction between the parties. Accordingly, we find that the trial court erred in awarding damages for lost rent for the 24 months the property was not rented after the lease expired. We, however, find that the trial court did not err in awarding damages for lost rent for the three months needed to make the repairs and restore the property that resulted from Spitzer's breach. We further find that the trial court's use of a rental rate of $6,000 per month was appropriate.

{¶ 54} Spitzer's fifth assignment of error is sustained in part and overruled in part. The Browns' second and third cross-assignments of error are overruled.

VI

{¶ 55} In the sixth assignment of error, Spitzer challenges the trial court's award of prejudgment interest on the estimated costs of repairs and lost rents.

{¶ 56} "The award of prejudgment interest is compensation to the plaintiff for the period of time between the accrual of the claim and judgment, regardless of whether the judgment is based on a claim which was liquidated or unliquidated and even if the sum due was not capable of ascertainment until determined by the court." *Royal Elec. Constr. Corp. v. Ohio State Univ.* (1995), 73 Ohio St.3d 110, 652 N.E.2d 687, syllabus. The decision whether to grant or deny prejudgment interest rests within the sound discretion of the trial court and will not be disturbed absent a showing of abuse of that discretion. *Wagner v. Midwestern Indemn. Co.* (1998), 83 Ohio St.3d 287, 699 N.E.2d 507. However, once a plaintiff receives judgment on a contract claim, the court has no discretion but to award prejudgment interest under R.C. 1343.03(A). *Stoner v. Allstate Ins. Co.*, Morrow App. No. 05CA16, 2006-Ohio-3998, 2006 WL 2217752, ¶ 18.

{¶ 57} Once the Browns had a judgment on the underlying breach of lease, we find they were entitled to prejudgment interest as a matter of law. See id.

{¶ 58} Spitzer's sixth assignment of error is overruled.

## VII, VIII, IX, X, XI, XII, XIII, XIV[1]

{¶ 59} In the remaining assignments of error, Spitzer challenges as against the manifest weight of the evidence the trial court's findings that Spitzer was responsible for the replacement of nine specific items, to wit: the steel posts in the basement, the lintels, the roof trusses, the parking lot, the sidewalks, the roofs, and the garage doors.

{¶ 60} As an appellate court, we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent, and credible evidence upon which the fact finder could base its judgment. *Cross Truck v. Jeffries* (Feb. 10, 1982), Stark App. No. CA5758, 1982 WL 2911. Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578.

{¶ 61} Spitzer's arguments are predicated upon its assertion that it was not obligated to replace any items on the property except for broken glass. Having found in assignment of error one, supra, that Spitzer is responsible for the replacement of items necessitated by its failure to repair and maintain, the question before this court is whether the trial court had relevant, competent, and

---

1. In its appellant's brief, Spitzer noted that the discussion of these assignments of error included discussion of assignments of error 15 and 16; however, Spitzer did not list or argue a 15th or 16th assignment of error in its brief.

credible evidence upon which it could find that the items at issue needed to be replaced. We find that it did, with one exception, the roofs (Assignment of Error XIII).

{¶ 62} With respect to the steel posts in the basement, Robert Mural, an engineer with Mural & Son, Inc., a company that engages primarily in the repair of foundations and structural damage to homes and businesses, testified that the majority of the structural problems he had observed in his years of experience were created by water. He explained that if water is not kept away from the structural steel, it will begin to rust and, if not properly maintained, will deteriorate. The testimony at trial revealed that one of the basement windows had been broken and the pane replaced with wood. Because the wood eventually rotted, water penetrated into the basement and rusted the hot water tank, which caused water leakage. Additionally, the boiler was compromised by rust as a result of water leakage from overhead pipes. Steam billowed out of holes in the boiler and overhead pipes. This wet, moist atmosphere contributed to, if not completely caused, the deterioration of the steel posts. Had Spitzer replaced the broken window pane, as it was obligated to do, and addressed the rust on the hot-water tank, boiler, and overhead pipes, the basement would not have become such a corrosive environment. We find that Spitzer's continuous failure to perform routine repairs and maintenance resulted in the property falling into such a state of decay as to need major repairs and the replacement of a number of structural elements, including the lintels and the garage doors. We recognize that the building was old when Spitzer began its occupancy of the property. We also recognize that age is a factor in the condition of structural elements. However, the testimony revealed that age did not play a significant part in the deterioration of the property.

{¶ 63} Notwithstanding our decision regarding most of the structural elements, we find that the trial court's finding that Spitzer was responsible for the replacement of the roofs was against the manifest weight of the evidence. Experts for both parties testified that both roofs were beyond their useful life expectancies. According to the Browns' general contractor, Bob Anthony, the flat roof, which had been installed in 1963, had a life expectancy of 15 years, and the barrel roof, installed in 1984, also had a life expectancy of 15 years. Anthony noted that if the roofs had been properly maintained, the life expectancy would have increased by 10 or 15 years. In other words, the useful life of the flat roof would have ended in 1993, at the latest; and the useful life of the barrel roof would end in 2014, at the latest. Spitzer's expert, Dean Olivieri, testified that after 20 years, any flat roof would need to be replaced solely because of its age. No amount of maintenance by Spitzer between 1984 and 1988 would have changed the need for replacing the flat roof. Conversely, Spitzer's lack of

maintenance of the roofs did not accelerate the deterioration of the roofs. Olivieri testified similarly with respect to the barrel roof, which needed to be replaced after 20 years (in 2004) due to its age. We find that because the last lease required Spitzer to surrender the premises in as good a condition as they were at the beginning of "occupancy," and the barrel roof was not in existence at that time but was subsequently added by Spitzer, Spitzer is likewise not liable for replacement of the barrel roof.[2]

{¶ 64} Based upon the foregoing, Spitzer's seventh, eighth, ninth, tenth, 11th, 12th, and 14th assignments of error are overruled. Spitzer's 13th assignment of error is sustained.

## THE BROWNS' CROSS–APPEAL

### I

{¶ 65} In their first assignment of error on cross-appeal, the Browns submit that the trial court erred in granting Spitzer an extension of time in which to file its objections to the magistrate's decision and the trial transcript. The Browns further assert that the trial court erred in allowing Spitzer to supplement its objections.

{¶ 66} Civ.R. 53(D) governs proceedings before a magistrate and provides as follows:

{¶ 67} "(3) *Magistrate's decision; objections to magistrate's decision.*

{¶ 68} " * * *

{¶ 69} "(b) *Objections to magistrate's decision.*

{¶ 70} "(i) *Time for filing.* A party may file written objections to a magistrate's decision within fourteen days of the filing of the decision, whether or not the court has adopted the decision during that fourteen-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. If a party makes a timely request for findings of fact and conclusions of law, the time for filing objections begins to run when the magistrate files a decision that includes findings of fact and conclusions of law.

{¶ 71} " * * *

{¶ 72} "(iii) *Objection to magistrate's factual finding; transcript or affidavit.* An objection to a factual finding, whether or not specifically designated as a

---

**2.** Upon remand, a separate issue may arise with respect to the trusses supporting the roof(s). If there exists evidence that replacement is necessary because of the failure to keep the roof(s) in repair, this replacement cost may be assessed to Spitzer.

finding of fact under Civ.R. 53(D)(3)(a)(ii), shall be supported by a transcript of all the evidence submitted to the magistrate relevant to that finding or an affidavit of that evidence if a transcript is not available. With leave of court, alternative technology or manner of reviewing the relevant evidence may be considered. The objecting party shall file the transcript or affidavit with the court within thirty days after filing objections unless the court extends the time in writing for preparation of the transcript or other good cause. If a party files timely objections prior to the date on which a transcript is prepared, the party may seek leave of court to supplement the objections.

{¶ 73} " * * *

{¶ 74} "(5) *Extension of time.* For good cause shown, the court shall allow a reasonable extension of time for a party to file a motion to set aside a magistrate's order or file objections to a magistrate's decision. 'Good cause' includes, but is not limited to, a failure by the clerk to timely serve the party seeking the extension with the magistrate's order or decision."

{¶ 75} Spitzer filed its request for the transcript of the proceedings on June 28, 2007, 13 days after the filing of the magistrate's decision. On the same day, Spitzer filed a motion for an extension of time in which to file its objections and to obtain the transcript. The trial court issued an order requiring the parties to file their objections by July 13, 2007. Spitzer filed its preliminary objections as ordered. Therein, Spitzer advised the trial court of its intent to supplement the objections upon receipt of the trial transcript. The transcript was filed on December 10, 2007. Spitzer filed its supplemental objections on December 17, 2007. We find no abuse of discretion in the trial court's handling of Spitzer's requests.

{¶ 76} The Browns' first cross-assignment of error is overruled.

{¶ 77} The judgment of the Stark County Court of Common Pleas is affirmed in part and reversed in part, and the cause is remanded to the trial court to redetermine the damage award to appellees in accordance with our opinion.

Judgment affirmed in part
and reversed in part,
and cause remanded.

FARMER and EDWARDS, JJ., concur.

EDWARDS, JUDGE, concurring.

{¶ 78} I agree with the majority as to its analysis and disposition of this case.

{¶ 79} I write separately only to clarify why I concur in the disposition of the second assignment of error. In the front of his brief appellant sets forth its

second assignment of error as follows: "The trial court erred as a matter of law by awarding damages based on costs of repair instead of difference in value of the property if it had been maintained in the condition it was in at the time the lease began and the value as it was on the date the lease ended." In reading that assignment, I thought to myself that appellant might have set forth the correct legal theory on the calculation of damages. But, in the body of the brief, appellant sets forth the second assignment of error as follows: "Spitzer did not breach the 'surrender' clause or the 'repair' clause of the lease because it returned the premises in the same or better condition as they were in at the time Spitzer first occupied the premises." The discussion of the second assignment makes a factual argument that Spitzer had not breached the lease and had in fact "exceeded its obligations under the lease" and returned the property to the appellees in better condition than it was in when Spitzer took it over in 1984. There was no discussion on the legal theory of how to calculate damages after a lease has been breached.

{¶ 80} Therefore, I concur with the majority as to its disposition of the second assignment of error, even though the wording of the assignment itself would lead a reader to believe that the appellant had raised and discussed the argument that an incorrect calculation of damages had been made in this matter as a matter of law.